1  **BRODSKY & SMITH, LLC**
   Evan J. Smith, Esquire
2  9595 Wilshire Boulevard, Suite 900
   Beverly Hills, CA 90212
3  Phone:  (877) 534-2590
   Facsimile: (610) 667-9029
4  esmith@brodsky-smith.com

5  *Attorneys for Plaintiff Jesse Sloan*

6              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
7  ─────────────────────────────

8  JESSE SLOAN, on behalf of himself          :        Case No.:
   and all others similarly situated,         :
9                                             :
                          Plaintiffs,         :
10                                            :        **CLASS ACTION COMPLAINT**
                                              :
11            vs.                             :
                                              :        **JURY DEMAND**
12 RENTECH NITROGEN PARTNERS,                 :
   LP, MICHAEL S. BURKE, JOHN H.              :
13 DIESCH, JAMES F. DIETZ, KEITH B.           :
   FORMAN, MICHAEL F. RAY,                    :
14 RENTECH NITROGEN GP, LLC, CVR              :
   PARTNERS, LP, LUX MERGER SUB 1             :
15 LLC, AND LUX MERGER SUB 2,                 :
   LLC.                                       :
16                                            :
                          Defendants.         :
17                                            :
                                              :
18 ─────────────────────────────             :

19         Plaintiff, Jesse Sloan ("Plaintiff"), by his attorneys, on behalf of himself and those similarly

20 situated, alleges upon personal knowledge as to his own acts and upon information and belief as

21 to all other matters, based upon the investigation made by and through his attorneys, which

22 investigation included, *inter alia*, the review of United States Securities and Exchange

23 Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as

24 follows:

25                        **NATURE OF THE CASE**

26         1.      Plaintiff brings this unitholder class action on behalf of himself and all other

27 public unitholders of Rentech Nitrogen Partners, LP ("Rentech" or the "Partnership"), against

28 Rentech, the Partnership's Board of Directors (the "Board" or the "Individual Defendants), the

general partner of the Partnership, Rentech Nitrogen GP, LLC ("GP"), CVR Partners, LP ("CVR" or "Parent"), Lux Merger Sub 1, LLC ("Merger Sub 1"), and Lux Merger Sub 2, LLC ("Merger Sub 2") (collectively, the "Defendants"), in connection with their attempt to sell the Partnership to CVR by means of an unfair process and for an unfair price.  Plaintiff also brings claims against Defendants for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On August 10, 2015, Rentech and CVR jointly announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in CVR, through Merger Sub 1 and Merger Sub 2, acquiring all of the outstanding units of Rentech. Under the terms of the merger agreement, Rentech public unitholders, in exchange for each Rentech common unit held, will receive (i) 1.04 CVR common units, and (ii) $2.57 in cash; an approximate total valuation of $14.30 per each common Rentech Unit (based upon the August 7, 2015 CVR closing price, which was the final day of trading before the merger announcement) and an approximate total valuation of $533 million (the "Proposed Acquisition").

3.     Furthermore, the Merger Agreement contemplates the sale of one of the Partnership's two main properties (located in Pasadena, Texas) as a prerequisite to the consummation of the Merger Agreement, or, in the alternative a post-consummation spinoff of said facility.  In agreeing to this term, Rentech and the Individual Defendants have agreed to part with a lucrative and successful asset subject to the timetable of the Proposed Acquisition, thereby increasing the likelihood it will be sold for substantially less than its value to meet the requirements present in the Merger Agreement.  Additionally, by agreeing to sell the Pasadena facility, Rentech and the Board will fundamentally weaken the Partnership's further standalone business prospects thus making it extremely unlikely that any third party interested in purchasing the Partnership will do so after such a sale has been effectuated.

4.     The Board has violated Rentech's Third Amended and Restated Partnership Agreement of Limited Partnership dated November 5, 2012, ("LPA," as further described below) and breached its express and implied contractual duties, as well as fiduciary duties owed to

1  Plaintiff and other Rentech unitholders by agreeing to the Merger for grossly inadequate

2  consideration.  As described in more detail below, given Rentech's recent strong performance as

3  well as its future growth prospects, the consideration unitholders will receive is inadequate and

4  undervalues the Partnership.

5          5.      Additionally, by approving the Proposed Acquisition, the Individual Defendants

6  have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*,

7  (i) agreeing to sell Rentech without first taking steps to ensure that Plaintiff and Class members

8  (defined below) would obtain adequate, fair and maximum consideration under the

9  circumstances; and (ii) engineering the Proposed Acquisition to benefit themselves and/or CVR

10 without regard for Rentech public unitholders.  Accordingly, this action seeks to enjoin the

11 Proposed Acquisition and compel the Individual Defendants to properly exercise their fiduciary

12 duties to Rentech unitholders.

13         6.      Furthermore, the Individual Defendants, as defined herein, have exacerbated their

14 breaches of express and implied contractual duties and fiduciary duty by agreeing to lock up the

15 Merger with preclusive and onerous deal protection devices that preclude other bidders from

16 making successful competing offers for the Partnership and act to render the Merger a fait

17 accompli.  For example, the Board agreed to: (i) a "no solicitation" provision that prevents the

18 Partnership from negotiating with or providing confidential information to competing bidders

19 except under extremely limited circumstances; (ii) a "matching rights" provision that allows

20 CVR to match any competing proposal in the unlikely event that one emerges; and (iii) up to

21 $41,200,000 in termination fees and expenses ($31,200,000 termination fee and up to

22 $10,000,000 expenses) if the Board agrees to a competing proposal.

23         7.      The termination fee is particularly egregious considering CVR strong-armed

24 Rentech into agreeing to it, and the fee itself is significantly above customary termination fees

25 for similar transactions.  The termination fee itself is almost 6% of the transaction and violative

26 of existing precedent regarding the scope of such fees.  With the expenses added in, the total

27 exposure to Rentech skyrockets to almost 8% of the deal price. Notably, there is no reciprocal

28 termination fee exposure to CVR.  Moreover, the circumstances under which the termination was

CLASS ACTION COMPLAINT

1  agreed to was coercive.  Essentially, CVR refused to engage in a transaction with Rentech unless

2  the Company would agree to a termination fee that was high enough to preclude other bidders

3  from entering the process.

4     8. Specifically, CVR had initially proposed that the Merger Agreement contain *no*

5  fiduciary out.  When Rentech would not agree with CVR's proposal, CVR came up with a

6  second proposal: the merger agreement could contain a fiduciary out, but the termination fee

7  would have to be *at least* 5% of the enterprise value. Believing that such a proposal "could be

8  perceived to preclude a superior proposal," Rentech informed CVR that it was not an acceptable

9  fee.  When CVR "refused to negotiate downward from a combined termination fee and expense

10  reimbursement of 5% of the enterprise value," negotiations temporarily ceased.  Ultimately

11  however, CVR would not waiver and the parties agreed to a termination fee of over 5% of the

12  enterprise value.  Thus, although CVR agreed to a fiduciary out provision, it still obtained its

13  desired result of shutting out any potential third parties from coming in and making a superior

14  offer.  The termination fee and other deal protection provisions substantially and improperly

15  limit the Board's ability to act with respect to investigating and pursuing superior proposals and

16  alternatives to the Merger.

17     9. In addition, in connection with the Merger, on September 17, 2015, CVR filed a

18  Form S-4 Registration Statement ("Registration Statement") with the SEC that failed to make all

19  material disclosures and contained materially misleading statements about the Merger.  As

20  explained below, the Registration Statement exposes some details of the highly flawed sales

21  process, but fails to disclose a myriad of material facts concerning the Merger and provides

22  unitholders with materially misleading information, thereby rendering unitholders unable to

23  make an informed decision on whether to vote in favor of the Merger.

24     10. Consequently, the Individual Defendants have breached their implied and express

25  contractual duties and fiduciary duties of loyalty and due care, aided and abetted by CVR.

26     11. Absent judicial intervention, the merger will be consummated, resulting in

27  irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps

28  taken by Defendants in entering into the merger agreement without attempting to maximize

1  unitholder value in order to obtain millions of dollars in benefits for themselves.  Immediate

2  judicial intervention is warranted here to rectify existing and future irreparable harm to the

3  Partnership's unitholders.  Plaintiff, on behalf of the Class, seeks only to level the playing field

4  and to ensure that if unitholders are to be ultimately stripped of their respective equity interests

5  through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that is

6  not overtly improper, unfair and illegal, and that all material information concerning the

7  Proposed Acquisition is disclosed to the Rentech unitholders so that they are able to make

8  informed decisions as to whether to vote in favor or against the Proposed Acquisition.

9                                                  **PARTIES**

10        12.    Plaintiff, Jesse Sloan, is an individual.  The Plaintiff is, and at all times relevant

11  hereto, has been a Rentech unitholder and is a resident of New Mexico.

12        13.    Defendant Rentech is a nitrogen fertilizer company formed by Rentech, Inc. as a

13  publicly traded master limited partnership.  The Partnership is organized in the state of Delaware

14  and has a principal place of business located at 10877 Wilshire Boulevard, 10th Floor, Los

15  Angeles, California 90024.  The Partnership owns two fertilizer production facilities, one located

16  in East Dubuque, Illinois and the other in Pasadena, Texas, the latter of which is the third largest

17  producer of ammonium sulfate fertilizer in North America.  Rentech common units are publicly

18  traded on the New York Stock Exchange ("NYSE") under the symbol "RNF."  As of July 31,

19  2015, there were over 38 million common units outstanding.

20        14.    Defendant Michael S. Burke ("Burke") joined the Rentech Board of Directors in

21  2011.

22        15.    Defendant John H. Diesch ("Diesch") joined the Rentech Board of Directors in

23  2011.  Diesch also serves as the Partnership's President.

24        16.    Defendant James F. Dietz ("Dietz") joined the Rentech Board of Directors in

25  2012.

26        17.    Defendant Keith B. Forman ("Forman") joined the Rentech Board of Directors in

27  2014.  Forman serves as the Partnership's Chief Executive Officer ("CEO").

28

CLASS ACTION COMPLAINT

18.     Defendant Michael F. Ray ("Ray") joined the Rentech Board of Directors in 2011.

19.     Defendants Burke, Diesch, Dietz, Forman, and Ray identified in ¶¶ 14-18 are collectively referred to as the "Individual Defendants."  By reason of their positions as officers and/or directors of the Partnership, the Individual Defendants are in a fiduciary relationship with plaintiff and the other Rentech public unitholders, and owe plaintiff and other Rentech unitholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

20.     Defendant GP is a Limited Liability Company organized under the laws of the state of Delaware.  GP is the general partner of the Partnership and its Board of Directors serve as the Board of Directors of the Partnership.  GP maintains a registered agent for service of process at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

21.     Defendant CVR is a publicly traded limited partnership fund organized in the State of Delaware and with its principle place of business located at 2277 Plaza Drive, Suite 500, Sugar Land, Texas 77479.  CVR owns, operates, and grows a nitrogen fertilizer business and produces, amongst other things, ammonia and urea ammonium nitrate fertilizers.  CVR common units are publicly traded on the NYSE under the symbol "UAN".

22.     Defendant Merger Sub 1 is a Delaware Limited Liability Company created for the sole purpose of effectuating the Proposed Acquisition.  It can be served care of The Corporation Service Company, its registered agent, at 2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

23.     Defendant Merger Sub 2 is a Delaware Limited Liability Company created for the sole purpose of effectuating the Proposed Acquisition.  It can be served care of The Corporation Service Company, its registered agent, at 2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(a). This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

25.     Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

## SUBSTANTIVE ALLEGATIONS

### Rentech Background

26.     Rentech produces and sells nitrogen fertilizer products in the United States and internationally. Rentech primarily operates out of two facilities, one based in East Dubuque, Illinois and the other based in Pasadena, Texas.

27.     Rentech completed its initial public offering in November 2011. The structure of this offering and the resulting partnership included the use of a variable distribution policy whereby quarterly cash distributions were based on cash flows which varied seasonally. This model was based off the model utilized by CVR in its public offering in April 2011.

28.     Rentech's East Dubuque facility produces nitrogen fertilizers and has the flexibility to vary product mix significantly. This allows the plant to upgrade ammonia production into varying amounts of urea ammonia nitrate, nitric acid and liquid and granulated urea each season, depending on market demand, pricing and storage availability.

29.     Rentech's Pasadena facility is the third largest producer of ammonium sulfate fertilizer in North America, and the largest producer of synthetic granulated ammonium sulfate in North America. The plant's other products include ammonium thiosulfate and sulfuric acid.

30.     Rentech released its Q2 2015 financial results on August 11, 2015, and notably announced a cash distribution of $1.00 per unit for that quarter.

31.     In addition Q2 2015 saw great financial performance from the Partnership, with gross profits increasing from $28.2 million to $44.7 million year-over-year. Additionally adjusted EBITDA was up from $30.7 million to $47.7 million year-over-year.

CLASS ACTION COMPLAINT

32.     Additionally, the financial reports also discussed financial results on a six-month basis; showing that the partnership's revenues for the current six month period were $179.0 million, a clear increase from the previous six month period revenues of $169.9 million. Additionally, gross profits were up significantly in the six month financial reporting period, from $42.0 million to $63.5 million.  Finally, Adjusted EBITDA also increased from $42.2 million to $68.8 million from the previous six month period.

33.     Speaking to these great financial results, Defendant Forman stated, "Our second quarter results exceeded our expectations."  Forman went on to praise the Pasadena facility in particular, stating "I'm pleased to see the Pasadena facility generate another quarter of positive EBITDA.  We are well on our way to generating EBITDA in the range of $10 million at Pasadena this year."

34.     Additionally Forman predicted further financial success for the remainder of the 2015 year, stating "We are forecasting 2015 to be our second best year since going public, with cash distributions for the year of approximately $2.00 per unit and consolidated EBITDA of about $118 million."

35.     Rentech's recent growth is not an anomaly, but rather a trend.  In presenting Rentech's Q1 2015 financial results, released on May 11, 2015 Forman stated "Margins improved from last year's first quarter due to strong demand for both ammonia and ammonium sulfate, higher ammonium sulfate prices and lower natural gas prices."

36.     The Q1 2015 results saw across the board year-over-year increases in various financial categories.  Revenues increased from $56.3 million to $69.2 million; gross profits increased from $13.8 million to $18.8 million; Adjusted EBITDA increased from $11.5 million to $19.2 million; and net income increased from $3.1 million ($0.08 per basic unit) to $9.0 million ($0.23 per basic unit).

37.     This sharp increase in Q1 of 2015 did not go unnoticed; Roberto Pedone, a financial analyst with TheStreet.com, included Rentech on a May 11, 2015 list of "4 Breakout Stocks".

CLASS ACTION COMPLAINT

*The Proposed Acquisition*

38.     Prior to 2014 Rentech and CVR had periodic conversations about a potential combination of the two companies.  Most notably, on January 31, 2014, Jack Lipinski, Executive Chairman of CVR's GP, sent an unsolicited indication of interest to the Rentech Board to acquire 100% of the outstanding Rentech Units.  This indication of interest offered to buy Rentech for approximately 1.038 CVR units per Rentech Common units, which at the time represented no premium for Rentech unitholders.  This deal was turned down by Rentech on March 5, 2014.

39.     CVR and Rentech executives and directors continued to meet several times throughout 2014 to discuss potential combination possibilities.  On May 21, 2014, an informal meeting was facilitated by Mark Pytosh, head of CVR, and held with Douglas I. Ostrover, then a director of Rentech, to discuss a potential combination.

40.     Again, on June 24, 2014 an informal meeting was held at the request of Pytosh, this time with several Rentech executives including Executive Vice President Ramsbottom, to discuss possible combination options.

41.     On October 27, 2014, Pytosh again orchestrated a meeting with Ramsbottom to discuss possible combinations.

42.     On December 9, 2014, Rentech Board members held extensive discussions regarding the need for capital and strategies to enhance unitholder value.  Included in these conversations were representatives from Morgan Stanley who provided the directors with an overview of industry competitors' positions in relation to Rentech's and advised the Board on possible options.

43.     On December 10, 2014 Pytosh met again with Ostrover to discuss possible business combinations with CVR and Rentech.  This meeting was requested to follow up on the October 27, 2014 meeting between Pytosh and Ramsbottom.

44.     On February 11, 2015, the Rentech Board made a public announcement it was seeking strategic alternatives to enhance unitholder value.  Shortly thereafter, on February 12, 2015, Pytosh met with Ramsbottom to further discuss a possible business combination between Rentech and CVR.  Also present was Keith Forman, Rentech CEO.

45.     On February 12, 2015, Morgan Stanley was formally engaged by Rentech as a financial advisor for a potential transaction.

46.     Morgan Stanley subsequently contacted 51 parties that it believed would be of potential interest in acquiring Rentech.  Besides CVR, the Registration Statement does not specific who these contacted parties are or the criteria utilized to determine.

47.     In April of 2015, Rentech received at least five indications of interest.  Rentech also received several indications of interest regarding the Pasadena Facility at this time.  The Registration statement does not indicate whether these indication of interests had an impact on the Pasadena Facility not being included in the Merger Agreement between Rentech and CVR.

48.     Shortly thereafter, Party B withdrew its interest after Rentech indicated it was not interested in the form of the bid it had offered (which included a third party).

49.     On May 12, 2015, Party C advised Morgan Stanley it would not pursue the transaction further.  No reason was given in the Registration Statement for this action.

50.     On June 3, 2015, CVR updated its indication of interest with specific terms provided in a draft of a merger agreement.  On June 4, 2015, Morgan Stanley contacted Pytosh to indicate the terms offered were unacceptable due to insufficient consideration and the non-inclusion of the Pasadena Facility by Rentech.

51.     On June 5, 2015, Party D advised Morgan Stanley it would not pursue the transaction further.  No reason was given in the Registration Statement for this action.

52.     On June 11, 2015, Pytosh indicated that CVR was withdrawing its previous indication of interest as it did not wish to acquire the Pasadena facility, however on June 12, 2015, Pytosh contacted Morgan Stanley indicating that CVR still had continued interest in Rentech.  The Registration Statement provides no reason why CVR was not interested in the Pasadena facility.

53.     On June 16 and 17, 2015, Morgan Stanley and Latham & Watkins representatives made presentations to the Rentech Board regarding its options.  Rentech believed a combination with CVR was attractive but because no offer was presently on the table, it instructed Morgan

CLASS ACTION COMPLAINT

1  Stanley not to contact CVR.  The Registration Statement does not mention what, if any,

2  discussions were made regarding Party A.

3          54.     On June 26, 2015, Pytosh again reached out to Morgan Stanley with an oral

4  request including an updated purchase price and a promise that the parties would structure the

5  transaction in such a way as the Pasadena Facility would be monetized and sold.  Rentech

6  responded by requesting the compensation to unitholders be increased.

7          55.     Between July 14, and July 27, 2015, Rentech and CVR partners entered into

8  negotiations and exchanged several versions of a potential merger agreement, and discussed

9  several sticking points.

10          56.     Due diligence was conducted by both sides in early August, 2015.  In the course

11  of this due diligence on August 2, 2015, CVR provided to Morgan Stanley its financial

12  projections for the period of 2016 through 2019.  On August 4, 2015, these financial projections

13  were updated by CVR.  Given the fact that a significant percentage of the consideration to

14  Rentech unitholders would be CVR units and the clear difficulty in finding any market

15  comparisons to Rentech or a possible transaction with CVR, the Registration Statement fails to

16  disclose why these projections were provided so late in the process, how the board could made

17  its decision only five days after receiving these financial projections, or if further negotiations

18  regarding CVR's projected financial decline were entered into.

19          57.     From August 3 to August 7, 2015 Rentech and CVR negotiated regarding whether

20  the Merger Agreement should have a 'fiduciary out' option for Rentech.  Specifically, CVR had

21  initially proposed that the Merger Agreement contain *no* fiduciary out.  When Rentech would not

22  agree with CVR's proposal, CVR came up with a second proposal: the merger agreement could

23  contain a fiduciary out, but the termination fee would have to be *at least* 5% of the enterprise

24  value. Believing that such a proposal "could be perceived to preclude a superior proposal,"

25  Rentech informed CVR that it was not an acceptable fee.  When CVR "refused to negotiate

26  downward from a combined termination fee and expense reimbursement of 5% of the enterprise

27  value," negotiations temporarily ceased.  Ultimately, however, CVR would not waiver and a

28

CLASS ACTION COMPLAINT

'fiduciary out' was included in the Merger Agreement in exchange for a higher termination fee. of *over* 5% of the enterprise value.

58.     On August 9, 2015, after presentations from Morgan Stanley and Latham & Watkins, the Rentech Board voted to approve the merger.

59.     On August 10, 2015, Rentech and CVR jointly issued a press release announcing that Rentech had agreed to be acquired by CVR in the Proposed Acquisition.  The press release stated in relevant parts:

> **SUGAR LAND, Texas and LOS ANGELES, Aug. 10, 2015** /PRNewswire/ -- CVR Partners, LP (NYSE: UAN) and Rentech Nitrogen Partners, L.P. (NYSE: RNF) announced today the execution of a definitive merger agreement under which CVR Partners will acquire all outstanding units of Rentech Nitrogen. The combination excludes Rentech Nitrogen's Pasadena facility, which will be retained by current holders of Rentech Nitrogen, or sold separately for their benefit. Total consideration for Rentech Nitrogen excluding the Pasadena facility is $533 million, implying a total enterprise value of approximately $839 million, based on closing prices on August 7, 2015. The transaction is the culmination of a strategic review process publicly announced by Rentech Nitrogen on February 17, 2015.
>
> CVR Partners and Rentech Nitrogen will host a conference call today at 10 a.m. EDT to review additional details regarding today's announcement, as summarized in an investor presentation that will be posted on each partnership's website prior to the call.
>
> Under the terms of the transaction, each outstanding common unit of Rentech Nitrogen will be exchanged for 1.04 units of CVR Partners and $2.57 of cash. The value of the CVR Partners units plus the cash consideration, which excludes the value of the Pasadena facility, represents a 20.3% premium to the unit value implied from the unaffected exchange ratio on February 16, 2015, one day before Rentech Nitrogen announced its process to explore strategic alternatives; a 32.9% premium at the current exchange ratio; or a 14.1% premium to the unit value implied from the last 30-day volume weighted average price exchange ratio through August 7, 2015. Any value realized from the sale of the Pasadena facility would add to such premium.
>
> Upon closing of the transaction, Rentech Nitrogen's unitholders (including Rentech, Inc.) will own approximately 40.5 million units, or 35.6%, of the combined partnership. As part of the transaction, CVR Partners will assume or refinance Rentech Nitrogen's net debt, which was approximately $307[1] million as of March 31, 2015.
>
> "The merger of CVR Partners and Rentech Nitrogen Partners creates a new leader in the growing nitrogen fertilizer industry. Once the merger is complete, we will be the second largest producer of urea ammonium nitrate (UAN) in North America," said Jack Lipinski, executive chairman of CVR Partners. "In addition to enhancing

CLASS ACTION COMPLAINT

our current attractive market position, we expect the merger will be double-digit accretive to distributable cash per unit before synergies. The combination of our two strategically located fertilizer assets in Kansas and Illinois, a strong combined balance sheet and highly experienced management teams positions the merged companies to generate long-term value for unitholders."

"The addition of Rentech Nitrogen's East Dubuque fertilizer facility increases our scale and diversifies our geography and raw material feedstock," said Mark Pytosh, chief executive officer of CVR Partners. "Our customers will benefit from the expanded availability and variety of nitrogen fertilizer products manufactured at the two facilities. The merger also expands our footprint into the upper Corn Belt region, which has the largest concentration of users in the U.S. for the direct application of nitrogen fertilizer products.

"The merger of CVR Partners and Rentech Nitrogen Partners brings significant value to our respective unitholders, customers and employees," Pytosh said. "We welcome the talented and experienced Rentech Nitrogen employees to CVR Partners."

"We believe this combination with CVR Partners is a compelling opportunity to create value for Rentech Nitrogen's unitholders. The transaction is structured to provide our unitholders with significant value, as well as the chance to participate in future value creation in a combined partnership that is well-positioned for success," said Keith Forman, chief executive officer of Rentech Nitrogen. "We believe that the resulting company will benefit from larger scale; diversification of plants, feedstocks, and markets; and reduced costs. We intend to immediately return to a focused process to sell the Pasadena facility, before the closing of the merger with CVR Partners."

Strategic Rationale

The combination of two pure-play, complementary nitrogen fertilizer producers creates an entity of significantly increased scale and production capacity, improved overall operating reach and greater cash flow generation. The combined entity will also benefit from the world's most attractive grain market in the Mid Corn Belt, in addition to competitive and diversified feedstocks. Furthermore, both have identical distribution policies, where they pay out to unitholders all cash available for distribution each quarter, and their opposite year plant turnarounds reduce earnings volatility.

The merger provides unitholders with ownership in a much larger and more diverse entity with a combined enterprise value of over $1.6 billion based on closing prices on August 7. The combined entity will have a stronger balance sheet with increased liquidity in the capital markets and will be capable of pursuing significantly larger and more meaningful growth opportunities as the industry consolidates.

The merger is structured to provide the unitholders of Rentech Nitrogen with an opportunity to benefit from potential future unit price appreciation and increased cash distributions through ownership of CVR Partners' common units.

Financial Details

1
2
3

CVR Partners expects this transaction to be double-digit accretive to distributable cash per unit before synergies. The partnership expects to realize meaningful synergies of at least $12 million, from SG&A cost savings, logistics and procurement improvements, and more strategic and efficient marketing of the combined products.

4
5
6
7
8
9

Each partnership has in place plans to increase the output of products and improve efficiency. CVR Partners' output of ammonia is expected to increase by approximately 75 tons per day in the second half of 2016, as a result of additional hydrogen supply which will be available from the hydrogen plant currently under construction at the adjacent Coffeyville refinery of CVR Refining, LP. Rentech Nitrogen expects to increase its ammonia production by 50 tons per day, and reduce energy input for each ton of ammonia produced by 1.3 MMBTU beginning in the second half of 2016, following the completion of the new ammonia converter project that is currently underway.

10
11

Rentech Nitrogen will distribute to its unitholders, pro rata, net proceeds of any future sale of the Pasadena facility. There can be no assurances that the Pasadena facility can be sold prior to the closing date of the merger or at all.

12
13

The cash portion of the consideration is expected to be taxable to Rentech Nitrogen unitholders while the distribution of units in CVR Partners is expected to be tax-free.

14

Governance and Leadership

15
16
17
18

Upon closing, the Board of Directors of the general partner of CVR Partners will increase from seven to 11 directors, including two newly appointed designees of CVR Energy, Inc. and two newly appointed designees of Rentech, Inc. Jack Lipinski, executive chairman of CVR Partners, will serve as executive chairman of the combined partnership that will operate under the name CVR Partners. Mark Pytosh, chief executive officer of CVR Partners, will serve as chief executive officer.

19

Pro-Forma Ownership Profile

20
21

Existing unitholders of CVR Partners will own approximately 64.4% of the combined entity; CVR Energy, Inc., the owner of the general partner of CVR Partners, will own approximately 34.1%.

22
23
24
25
26
27
28

Rentech Nitrogen's unitholders will initially own approximately 35.6% of the combined entity. Rentech, Inc., the current owner of approximately 59.7% of Rentech Nitrogen's common units, will initially own approximately 21.3% of the combined entity. In conjunction with the closing of the merger, Rentech will exchange a portion of the CVR Partners units it receives for $140 million of debt and convertible preferred securities owned by GSO Capital Partners, at a unit price to be determined based on a 15% discount from average closing prices in the period just before closing of the merger. This exchange will result in GSO Capital Partners owning a significant portion of the CVR Partners units initially received by Rentech; the exact number of units cannot be determined until the closing of the merger. However, based on the volume weighted average price leading up to

August 7, Rentech would own approximately 10% of the combined entity and GSO would own approximately 11%. The units that Rentech and GSO Capital Partners will receive will be subject to restrictions on sale for six months from the closing date of the merger.

Timing and Closing

The Board of Directors of each partnership has approved the transaction. The transaction is subject to approval by a majority of the outstanding Rentech Nitrogen common units. Certain affiliates of Rentech, Inc. that together hold 59.7% of the outstanding Rentech Nitrogen common units have entered into a support agreement pursuant to which they have agreed to vote all of the Rentech Nitrogen common units owned by them in favor of the merger. The completion of the merger is also subject to the disposition of the Pasadena facility by Rentech Nitrogen, either by sale to a third party, or through the creation of a separate entity that owns the Pasadena facility, to be retained by unitholders of Rentech Nitrogen. Completion of the merger, assuming the requisite unitholder vote is obtained, and subject to the terms and conditions outlined in the merger agreement, is expected to occur by the end of 2015 and no later than May 31, 2016.

Regular Quarterly Cash Distributions

Cash distributions will continue to be paid by each partnership pursuant to their own cash distribution policies while the merger is pending.

***The Inadequate Merger Consideration***

20.     Significantly, analyst expectations, the Partnership's strong market position, extraordinary growth, synergistic value to Parent, and positive future outlook, establish the inadequacy of the merger consideration.

60.     The compensation afforded under the Proposed Acquisition to Company unitholders significantly undervalues the Partnership.  Pursuant to the terms of the Merger Agreement, the transaction values Partnership units at approximately $14.30 per unit. Significantly, a group of six Yahoo! Finance analysts have valued the Partnership as high as $22.00 per unit, a valuation over 53% higher than offered in the Proposed Acquisition.

61.     Furthermore, several other financial analyst firms have valued the Partnership considerably higher than the unit price offered in the Proposed Acquisition in previous months. Notably, Imperial Capital valued the Partnership as high as $22.00 per unit within the last six months.

62.     Additionally, the $14.30 per unit valuation offered is well below $16.12 per unit, the Partnership's 52 week trading high.

63.     Meanwhile, CVR's statements regarding the Proposed Acquisition do not address the fact that the units of Rentech common unitholders are being significantly undervalued, but instead focus on how this deal will help their own company.  Jack Lipinski, CVR executive chairman, stated "Once the merger is complete, we will be the second largest producer of urea ammonium nitrate (UAN) in North America."

64.     As discussed *supra*, the Partnership has excellent growth prospects.  Defendant Forman has consistently commented on the positive nature of the Partnership's financial reports and is on the record as predicting 2015 to be the most lucrative and successful year in the Partnership's history.

65.     Moreover, the synergistic value of Rentech to CVR also commands a larger premium.  The Proposed Acquisition will cement CVR's position as the leading manufacture of urea ammonium nitrate in North America while simultaneously removing one of its strongest competitors.  In an August 10, 2015 article, Moody's notes that as a result of the synergies present in the merger, the East Dubuque facility will be able to double its output, increasing profits dramatically.

66.     In addition, it appears as though certain of the Individual Defendants may have been motivated by their own self-interest in agreeing to the Proposed Acquisition.  For example, Defendant Forman stands to gain over $30 million for his various options in the Partnership, which will vest upon the change in control being effected by the consummation of the Merger Agreement.

67.     Accordingly, and in breach of their fiduciary duties, the Board has denied Rentech's unitholders the fair and adequate value of their investment by entering into the Proposed Acquisition for inadequate consideration.

***Flawed Sales Process***

68.     The sales process was flawed in a number of respects.  In addition to those otherwise detailed herein:

a.   The Board did not create a special committee to run the sales process, instead permitting individual directors and executives such as

1    Ramsbottom, Ostrover, and/or Forman to negotiate directly with Pytosh

2    and CVR.  Furthermore, there was little congruity regarding which

3    Rentech Director or Executive would talk to CVR, which could have

4    possibly lead to a muddying of the waters during negotiations.

5         b.   The Registration Statement is silent on how Morgan Stanley chose the 51

6              parties it solicited as potential merger partners.

7         c.    The Registration Statement is silent regarding Company A, and why and

8              in what way it exited negotiations with Rentech.

9    ***Preclusive Deal Mechanisms***

10        69.    The Merger Agreement contains certain provisions that unduly benefit CVR by

11   making an alternative transaction either prohibitively expensive or otherwise impossible.

12   Significantly, the Merger Agreement contains a termination fee provision that requires Rentech

13   to pay up to $31,200,000 in fees and $10,000,000 expenses to CVR if the Merger Agreement is

14   terminated under certain circumstances.  Incredibly, the termination fee itself is almost 6% of the

15   transaction and violative of existing precedent regarding the scope of such fees.  With the

16   expenses added in, the total exposure to Rentech skyrockets to almost 8% of the deal price.

17   Moreover, under one circumstance, Rentech must pay this termination fee even if it

18   consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months*

19   *following the termination* of the Merger Agreement.  Finally, and further prejudicing Rentech,

20   there is no reciprocal termination fee obligation on CVR.  The termination fee will make the

21   Partnership that much more expensive to acquire for potential purchasers.  The termination fee in

22   combination with other preclusive deal protection devices will all but ensure that no competing

23   offer will be forthcoming.

24        70.    Pursuant to § 6.5, the Merger Agreement contains a "No Solicitation" provision

25   that restricts Rentech from considering alternative acquisition proposals by, *inter alia*,

26   constraining Rentech's ability to solicit or communicate with potential acquirers or consider their

27   proposals.  Specifically, the provision prohibits the Partnership from directly or indirectly

28   soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to

1  consider an "*unsolicited bona fide written Acquisition Proposal*" if it constitutes or is reasonably

2  calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

3        71.      Moreover, the Agreement further reduces the possibility of a topping offer from

4  an unsolicited purchaser.  Here, Defendants agreed to provide CVR information in order to

5  match any other offer, thus providing CVR access to the unsolicited bidder's financial

6  information and giving CVR the ability to top the superior offer.  Thus, a rival bidder is not

7  likely to emerge with the cards stacked so much in favor of CVR.

8        72.      In addition, the Merger Agreement does not include protections to ensure that the

9  consideration payable to unitholders will remain within a range of reasonableness.  In a

10  conventional transaction which contemplates units of the acquiring partnership as a whole or part

11  of the consideration offered in the Proposed Acquisition, the parties often negotiate and

12  implement a "floor" on the value of the consideration payable to unitholders, which establishes

13  the lowest possible price payable.  Such transactions also often include a "collar," which

14  establishes parameters that attempt to minimize the impact of stock price fluctuations on the

15  value of the consideration payable to unitholders.  The Merger Agreement contains none of these

16  protections.  Rather, the Merger Agreement contains a *fixed* exchange ratio of 1.04 which means

17  that Rentech unitholders will receive 1.04 units of CVR common units for each of their units,

18  *regardless of CVR's unit price at the close of the transaction*.  Thus, the consideration payable to

19  CVR unitholders is not insulated from fluctuations in CVR's unit price, and unitholders are left

20  in the precarious position of not knowing whether the consideration payable to them will decline

21  further.

22        73.      Furthermore, at the same time that the Partnership entered into the Merger

23  Agreement, certain large unitholders of the Partnership, entered into an agreement with CVR

24  pursuant to which such individuals have agreed, among other things, to vote their units of the

25  Partnership in favor of the approval of the Merger Agreement at a meeting of the Partnership's

26  unitholders to be held for the purpose of approving the Merger Agreement.  Collectively, the

27  signatories of the Voting and Support Agreement own approximately 60.00% of all Rentech

28  outstanding units.  Despite these agreements affectively locking up a majority of the Rentech

1    common units, the Merger Agreement does not contain a protective "majority of the minority"

2    provision.

3           74.    Finally, as discussed above *supra*, the Merger Agreement contains a condition

4    mandating that the Partnership use "commercially reasonable efforts" to consummate a sale of

5    the Pasadena Facility as a precondition for the consummation of the Proposed Acquisition (the

6    Merger Agreement also contemplates a fall back scenario wherein the surviving company will

7    spin off the Pasadena Facility post-merger).  By requiring the Partnership to dispose of one of its

8    most successful and lucrative assets Rentech and the Board have entered into a scenario wherein

9    full compliance with the Merger Agreement will mean a necessary and significant devaluation of

10   the Partnership, which will have the obvious effect of making the Partnership less appealing to

11   any third party bidders contemplating a purchase of the Partnership.  In addition, the Pasadena

12   Facility is one of the most lucrative manufacturing sites of fertilizer chemicals in North America

13   and its revenue generating abilities has been constantly praised by Defendant Forman.  By

14   entering into the Merger Agreement the Board has created a deadline for which to sell the

15   Pasadena facility, even if no such tenable offer to purchase it exists within said timeframe.  This

16   situation undoubtedly results in a serious danger to Partnership unitholders whose investment

17   capital is significantly tied up in the Pasadena property.  The stated goals of the Directors in

18   consummating the Merger agreement and the intrinsic goals of the Partnership unitholders are

19   now in danger of being at odds due to this time crunch.

20          75.    Accordingly, the Partnership's true value is compromised by the consideration

21   offered in the Proposed Acquisition and the Proposed Acquisition is the product of the Board's

22   breaches of fiduciary duty, aided and abetted by CVR.

23           ***The Partnership's Directors and Officers Are Receiving Unique Benefits***

24          76.    Rentech's directors and officers will receive unique benefits in connection with

25   the merger.

26          77.    If the merger is completed, each Rentech phantom unit that is outstanding

27   immediately prior to the effective time and held by Rentech directors or officers who are not

28   continuing as an employee with the surviving entity will automatically vest in full and convert

into the right to receive the merger consideration.  In addition, any then-accumulated distribution equivalents payable with respect to such Rentech phantom unit will vest in full and be paid to the holder in cash at the effective time.

78.     Additionally, if the merger is completed, each Rentech phantom unit that is outstanding immediately prior to the effective time and held by Rentech directors or officers who are continuing as an employee with the surviving entity will automatically be converted into a replacement incentive award in CVR's Long Term Incentive Plan ("LTIP").

79.     The following table sets forth the aggregate number of Rentech phantom units owned by certain Rentech directors and officers, as well as their estimated value payable in the Proposed Acquisition:

| Name | Number of Rentech Nitrogen Phantom Units (#) | Estimated Value of Replacement CVR Partners Phantom Units or Merger Consideration (as applicable) ($) | Estimated Value of Accumulated Distribution Equivalents ($) | Total Estimated Value ($) |
|---|---|---|---|---|
| *Executive Officers* | | | | |
| John H. Diesch | 39,537 | 553,123 | — | 553,123 |
| *Non-Employee Directors* | | | | |
| Michael S. Burke | 890 | 12,451 | — | 12,451 |
| James F. Dietz | 1,780 | 24,902 | — | 24,902 |
| Michael F. Ray | 1,780 | 24,902 | — | 24,902 |

80.     In addition, under the terms of their employment agreements several Rentech officers or directors are entitled to severance packages should their employments be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Rentech common unitholders.  Furthermore Officers Dan J. Cohrs ("Cohrs") and Colin M. Morris ("Morris") are entitled to a "gross-up" payment from Rentech, covering all taxes, penalties and interest associated with any "golden parachute"

81.     The following table sets forth the Golden Parachute compensation for certain Rentech directors and officers, as well as their estimated value payable:

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits ($) | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|
| Keith B. Forman | 400,000 | — | 11,792 | — | 411,792 |
| Dan J. Cohrs | 296,960 | 187,326 | 11,792 | — | 496,078 |

CLASS ACTION COMPLAINT

| | | | | |
|---|---|---|---|---|
| John H. Diesch | 502,500 | 553,123 | 29,480 | — | 1,085,103 |
| Wilfred R. Bahl, Jr. | 381,600 | 130,247 | 19,653 | — | 531,500 |
| Marc E. Wallis | 524,000 | 135,661 | 19,653 | — | 679,314 |

82.     Moreover, while the Partnership's public unitholders will receive inadequate consideration for their units, certain officers and directors have negotiated positions for themselves in the surviving entity.  Specifically, Defendants Forman and Diesch, as well as Officers Cohrs, Bahl, and Wallis will continue with the surviving entity.

83.     Thus, while the Merger is not in the best interests of Rentech unitholders, it will produce lucrative benefits for the Partnership's officers and directors.

***The Materially Misleading and/or Incomplete Registration Statement***

84.     On September 17, 2015, CVR filed the Registration Statement with the SEC on Form S-4.  The Registration Statement fails to disclose material information leading up to the merger, fails to disclose or contains misleading disclosures concerning Morgan Stanley's financial analyses, and fails to disclose or contains misleading disclosure concerning financial projections.

85.     The Registration Statement fails to disclose material information or discloses misleading information regarding the background of the merger, specifically:

a.     The "strategic alternatives" discussed at the December 9, 2014 Rentech Board meeting;

b.     The market response to the February 17, 2015 announcement that Rentech had initiated a process to explore and evaluate potential strategic Alternatives;

c.     The market response to all material public announcements/press releases made during the chronology included in the Registration Statement;

d.     Regarding bids from CVR and Parties A - D in early April 2015, what date these bids were received by Rentech, as well as Rentech's closing price on the preceding trading day;

CLASS ACTION COMPLAINT

e.  What Rentech's closing price was on the preceding trading for each offer and/or counteroffer made during the chronology included in the Registration Statement;

f.  Regarding Parties A – D, which bidder was a strategic or financial buyer. Similarly, which interested parties were strategic or financial buyers throughout the chronology included in the Registration Statement;

g.  Regarding Party D's initial offer, the implied price per unit;

h.  Regarding all offers for the chronology included in the Registration Statement, the implied per unit;

i.  The reasons CVR was opposed to the inclusion of the Pasadena Facility in a potential merger;

j.  Why CVR provided older projections on August 2, 2015 to Rentech only to provide updated projections on August 4, 2015 and why Rentech did not receive CVR projections until only days prior to entering into the agreement; and

k.  The basis for a 6% termination fee and an almost 2% exposure on expenses in light of market standards?

86.  The Registration Statement Fails to disclose material information, or discloses misleading information, regarding Morgan Stanley's financial analysis, specifically:

a.  Regarding Morgan Stanley's use of Sensitivity Case projections for Rentech and CVR:

i.  The Registration Statement fails to disclose the full process and variables Morgan Stanley used to determine the "Rentech Nitrogen Sensitivity Case";

ii.  The Registration Statement fails to disclose the resulting projections from the calculation of the "Rentech Nitrogen Sensitivity Case", which were used by Morgan Stanley in its *Discounted Cash Flow Analysis*;

CLASS ACTION COMPLAINT

1       iii. The Registration Statement fails to disclose the full process and

2         variables used to determine the "CVR Partners Sensitivity Case";

3       iv. The Registration Statement fails to disclose the resulting

4         projections from the calculation of the "CVR Partners Sensitivity

5         Case", which were used by Morgan Stanley in its *Discounted Cash*

6         *Flow Analysis*;

7       v. The Registration Statement fails to explain why different projected

8         assumptions of the future ammonia and UAN price discounts were

9         used to determine the "Rentech Nitrogen Sensitivity Case" as

10        compared to the "CVR Partners Sensitivity Case";

11    b. Regarding Morgan Stanley's *Trading Range Analysis and Research Price*

12     *Targets*:

13       i. The Registration Statement fails to disclose a valuation summary

14        detailing the calculation of fully diluted shares, equity value (at the

15        unaffected price and the offer) and enterprise value (at the

16        unaffected price and offer) including any multiples calculated

17        therein;

18       ii. The Registration Statement fails to identify, quantify and source

19        the cost-of-equity assumptions for CVR and Rentech, respectively;

20    c. Regarding Morgan Stanley's *Historical Trading Range Analysis*:

21       i. The Registration Statement fails to disclose historical observed

22        yields and EBITDA multiples, in comparable detail to that

23        contained in Morgan Stanley's fairness presentation;

24    d. Regarding Morgan Stanley's *Historical Trading Range Analysis*:

25       i. The Registration Statement fails to justify why it used the less-

26        favorable pricing metrics (i.e. lower multiples, higher yields) for

27        Rentech but not for CVR;

28    e. Regarding Morgan Stanley's *Discounted Cash Flow Analysis*:

CLASS ACTION COMPLAINT

i.   The Registration Statement fails to disclose a definition of free cash flow;

ii.   The Registration Statement, given the early-August valuation date, fails to explain the apparent omission of free cash flows for the remainder of 2015;

iii.   The Registration Statement fails to identify, quantify and source the WACC assumptions for Rentech and CVR respectively;

iv.   The Registration Statement fails to justify the use of lower discount rates for CVR than for Rentech;

v.   The Registration Statement fails to disclose the implied perpetuity growth rates and/or yields corresponding to the assumed terminal pricing multiples of Rentech and CVR, respectively;

vi.   The Registration Statement fails to justify the use of higher terminal pricing multiples for CVR than for Rentech;

vii.   The Registration Statement fails to explain and justify the use of EBITDA for Rentech and adjusted EBITDA for CVR;

f.   Regarding Morgan Stanley's *Distribution Discount Analysis*:

i.   The Registration Statement, given the early-August valuation date, fails to disclose the basis for the apparent omission of distributions for the remainder of 2015;

ii.   The Registration Statement fails to identify, quantify and source the cost-of-equity assumptions for Rentech and CVR, respectively;

iii.   The Registration Statement fails to justify the use of lower discount rates for CVR than Rentech;

iv.   The Registration Statement fails to disclose the implied perpetuity growth rates and/or pricing multiples corresponding to the assumed terminal yields of Rentech and CVR, respectively;

CLASS ACTION COMPLAINT

v. The Registration Statement fails to justify the use of lower terminal yields for CVR than Rentech;

g. Regarding Morgan Stanley's *Analysis of Market Premiums Paid in Precedent Transactions*:

i. The Registration Statement fails to state why mixed consideration cash-and-stock transactions were apparently not examined;

ii. The Registration Statement fails to explain the omission of any analysis of pricing multiples or yields among the precedent transactions;

h. Regarding Morgan Stanley's *Pro Forma Distributable Cash Per Unit Accretion/Dilution Analysis*:

i. The Registration Statement fails to disclose how synergies were treated in the analysis;

ii. The Registration Statement fails to quantify the indicated accretion/dilution in each instance;

i. Regarding Morgan Stanley's *Relative Contribution Analysis*:

i. The Registration Statement fails to justify an at-market assumption, rather than the actual terms of the deal, with respect to Rentech and CVR's respective ownership percentages in the combined company;

ii. The Registration Statement fails to explain and justify the use of EBITDA for Rentech and adjusted EBITDA for CVR;

iii. The Registration Statement fails to disclose the actual ownership distribution implied by the transaction;

iv. The Registration Statement fails to give Morgan Stanley's conclusion on the *Relative Contribution Analysis* and how it was used by Morgan Stanley to assess the fairness of the offer;

CLASS ACTION COMPLAINT

87.     The Registration Statement Fails to disclose material information, or discloses misleading information, regarding the financial projections provided by CVR and Rentech, specifically:

        a.    With respect to the CVR's August 4, 2015 projections, was the 10% and 18% forecasted discounts included to reflect the historical discount based on CVR's actual prices, or to Rentech's historical prices;

        b.    The Registration Statement fails to disclose why the CVR projections were provided so close to the date the Rentech Board executed the Merger Agreement, especially considering that CVR's projections were "updated throughout the year as necessary for planning and budgeting purposes";

        c.    The *Unaudited Prospective Financial and Operating Information of CVR Partners* does not disclose:

            i.  Free Cash Flows

            ii.  Reconciliation of GAAP net income to:

                1.  Non-GAAP FCF

                2.  Non-GAAP EBTIDA and Adjusted EBITDA

                3.  Non-GAAP available cash for distributions

            iii.  Non-cash share-based compensation

            iv.  Major turnaround expenses

            v.  Loss on extinguishment of debt

            vi.  Loss on disposition of assets

            vii.  Dividends

            viii.  All figures for stub period consisting of second half of 2014

        d.    The *Unaudited Prospective Financial and Operating Information of Rentech Nitrogen* does not disclose:

            i.  Free Cash Flows

            ii.  Reconciliation of GAAP net income to:

                1.  Non-GAAP FCF

CLASS ACTION COMPLAINT

1                                2.  Non-GAAP EBTIDA and Adjusted EBITDA

2                                3.  Non-GAAP cash available for distributions

3                        iii.  Non-cash share-based compensation

4                        iv.  Major turnaround expenses

5                        v.  Loss on extinguishment of debt

6                        vi.  Loss on disposition of assets

7                      vii.  Dividends

8                    viii.  All figures for stub period consisting of second half of 2014

9        e.      The Registration Statement, in regards to "interest expense" fails to clarify

10            whether the qualifier "excluding capitalized interest" also applies to

11            Rentech's interest expense;

12       f.      The Registration Statement fails to explain why Rentech's adjusted

13            EBITDA includes a deduction for SBC while CVR's adjusted EBITDA

14            does not;

15       g.      The Registration Statement fails to explain and quantify the term "sales

16            volume impact due to turnaround";

17       h.      The Registration Statement fails to explain the term "distribution of cash

18            reserves" and fails to state for what purpose cash assumed to be reserved,

19            and what circumstances are assumed to lead to the release of such reserves

20            for distribution;

21       i.       The Registration Statement, with respect to maintenance capital

22            expenditures, fails to explain the qualifier "not funded by financing

23            proceeds," or why it was not used for CVR.

24                    **THE INDIVIDUAL DEFENDANTS' DUTIES PURSUANT TO THE**

                                  **LIMITED PARTNERSHIP AGREEMENT**

25

26        88.     Pursuant to § 2.1 of the LPA, "the rights, duties, liabilities and obligations of the

27 Partners and the administration dissolution and termination of the Partnership shall be governed

28 by the Delaware Act."

89.     Under § 1.1 of the LPA, the Delaware Act is defined as, "the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. Section 17-101, et seq., as amended, supplemented or restated from time to time, and any successor to such statute."  The agreement further defines Partners as the General Partner and the Limited Partners.

90.     Pursuant to 6 Del. C. § 17-101, "a partnership agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."  The Individual Defendants are therefore bound by a duty of good faith and fair dealing.

91.     Furthermore, under the Delaware Act, partnership agreements in Delaware cannot "eliminate the implied contractual covenant of good faith and fair dealing."  *Allen v. Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013).

92.     By virtue of their positions as directors of Rentech, the Individual Defendants, at all relevant times, had the power to control the influence, and did control and influence and cause Rentech to engage in the practices complained of herein.

93.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Partnership's unitholders and with due care.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in control, the directors must take all steps reasonably require to maximize the value unitholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the unitholders to make an informed voting decision.  To diligently comply with this duty, the directors may not take any action that:

    a.     Adversely affects the value provided to the corporation's unitholders;

    b.     Contractually prohibits them from complying with or carrying out their fiduciary duties;

    c.     Discourages or inhibits alternative offers to purchase control of the corporation or its assets;

CLASS ACTION COMPLAINT

      d.     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's unitholders; or

      e.     Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

94.     Moreover, Section 3.4 of the LPA provides that unitholders have the right "to obtain true and full information regarding the status of the business and financial condition of the Partnership" and "to obtain such other information regarding the affairs of the Partnership as is just and reasonable."

95.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, violated duties owed to Plaintiff and the other unitholders of Rentech, including their express and implied duties under the LPA and their duties of loyalty, good faith, candor and independence under both the Partnership's LPA and under the Delaware act, and have failed to provide Plaintiff and other Rentech unitholders with true, full, and fair disclosures concerning the Merger.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

96.     By reason of the Individual Defendants' positions with the Partnership as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public unitholders of Rentech and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, loyalty, and candor.

97.     By virtue of their positions as directors and/or officers of Rentech, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Rentech to engage in the practices complained of herein.

98.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Partnership's unitholders, and with due care.  To diligently comply with these duties, the directors of a partnership may not take any action that:

      a.     Adversely affects the value provided to the partnership's unitholders;

b.      Contractually prohibits them from complying with or carrying out their fiduciary duties;

c.      Discourages or inhibits alternative offers to purchase control of the partnership or its assets; or

d.      Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the partnership's unitholders.

99.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public unitholders of Rentech, including their duties of loyalty, good faith, independence, and candor.

**CLASS ACTION ALLEGATIONS**

100.    Plaintiff brings this action as a class action individually and on behalf of all holders of Rentech common units who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

101.    This action is properly maintainable as a class action.

102.    The Class is so numerous that joinder of all members is impracticable.  As of August 10, 2015, there were 38,927,609 common units of Rentech outstanding, resulting in hundreds, if not thousands of unitholders.

103.    There are questions of law and fact which are common to the Class including, *inter alia*, the following:

a.      Whether the Proposed Acquisition is unfair to the Class;

b.      Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c.      Whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class;

d.      Whether Defendants violated Federal laws;

CLASS ACTION COMPLAINT

e.     Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

f.     Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants;

g.     Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Acquisition; and

h.     Whether Rentech, GP, CVR, Merger Sub 1, and/or Merger Sub 2 aided and abetted the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Proposed Acquisition.

104.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

105.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

106.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

CLASS ACTION COMPLAINT

**FIRST COUNT**
**Against the Individual Defendants and GP for Breach of Express and Implied Duties in
Connection with the Merger**

107.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

108.     GP and the Individual Defendants owed the Partnership and its public unitholders duties as defined in the LPA.  Further, Rentech, GP, and the Individual Defendants owed the public unitholders the implied duty of good faith and fair dealing, which the LPA could not eliminate.

109.     Rentech, GP, and the Individual Defendants breached their express obligations under the LPA and the implied duty of good faith and fair dealing by, for example, causing Rentech to enter into the Merger Agreement and pursue the Merger, and by failing to disclose material information to allow Rentech unitholders to cast a fully informed vote on the Merger.

110.     By reason of the foregoing, GP and the Individual Defendants approved the Proposed Acquisition in bad faith.

111.     Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**
**Aiding and Abetting the Individual Defendants' and GP's Breaches of Express and Implied
Duties in Connection with the Proposed Acquisition
Against the Individual Defendants, Rentech, GP, and CVR**

112.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

113.     As set forth above, the Individual Defendants and GP owed Rentech's public unitholders duties and obligations that the Individual Defendants breached in respect to the Merger.

114.    Further, each of the other Defendants knowingly participated in the foregoing breaches by directly or indirectly causing the Individual Defendants to pursue the Merger and Enter into the Merger Agreement, thereby causing damage to Plaintiff and the Class.

115.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.\

**THIRD COUNT**
**On Behalf of Plaintiff and the Class Against the Individual Defendants**
**<u>For Breach of Fiduciary Duties</u>**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Rentech unitholders.

118.    By the acts, transactions, and courses of conduct alleged herein, Defendants individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class the true value of their investment in Rentech.

119.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to Rentech unitholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Rentech unitholders receive adequate consideration for their units, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for the Partnership, and caused a materially incomplete and misleading Registration Statement concerning the Proposed Transaction to be filed with the SEC.

120.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

121.    As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Rentech's assets and businesses, have been and will be prevented from obtaining a fair price for

- 33 -
<u>CLASS ACTION COMPLAINT</u>

their Rentech common units, and will not be able to cast an informed vote the Proposed Transaction.

122.    Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiffs and the members of the Class, all to the irreparable harm of the members of the Class.

123.    Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**FOURTH COUNT**
**On Behalf of Plaintiff and the Class**
**Against Rentech, GP, CVA, Merger Sub 1, and Merger Sub 2**
**For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

124.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    Rentech, GP, CVA, Merger Sub 1, and Merger Sub 2 have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Retnech's unitholders, and have participated in such breaches of fiduciary duties.

126.    Rentech, GP, CVA, Merger Sub 1, and Merger Sub 2 knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Rentech, GP, CVA, Merger Sub 1, and Merger Sub 2 rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

**FIFTH COUNT**
**On Behalf of Plaintiff and the Class for Violations of Section 14(a)**
**of the Exchange Act and Rule 14a-9 Promulgated Thereunder**
**Against the Partnership and the Individual Defendants**

127.    Plaintiff repeats all previous allegations as if set forth in full herein.

128.    The Individual Defendants have issued the Registration Statement with the intention of soliciting unitholder support of the Merger.

129.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. 240.14a-9.

130.    Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

131.    The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

132.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

133.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**SIXTH COUNT**
**On Behalf of the Plaintiff and the Class for Violations of Section 20(a)**
**of the Exchange Act Against the Individual Defendants**

134.    Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Rentech unitholders.

135.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

136.    The Individual Defendants acted as controlling persons of Rentech within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Rentech, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the Registration

1  Statement filed with the SEC, they had the power to influence and control and did influence and

2  control, directly or indirectly, the decision making of the Partnership, including the content and

3  dissemination of the various statements which Plaintiff contends are false and misleading.

4       137.   Each of the Individual Defendants were provided with or had unlimited access to

5  copies of the Registration Statement and other statements alleged by Plaintiff to be misleading

6  prior to and/or shortly after these statements were issued and had the ability to prevent the

7  issuance of the statements or cause the statements to be corrected.

8       138.   In particular, each of the Individual Defendants had direct and supervisory

9  involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have

10  had the power to control or influence the particular transactions giving rise to the securities

11  violations alleged herein, and exercised the same.  The Registration Statement at issue contains

12  the unanimous Registration of each of the Individual Defendants to approve the Merger.  They

13  were, thus, directly involved in the making of this document.

14       139.   In addition, as the Registration Statement sets forth at length, and as described

15  herein, the Individual Defendants were each involved in negotiating, reviewing, and approving

16  the Merger.  The Registration Statement purports to describe the various issues and information

17  that the Individual Defendants reviewed and considered.  The Individual Defendants participated

18  in drafting and/or gave their input on the content of those descriptions.

19       140.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

20  of the Exchange Act.

21       141.   As set forth above, the Individual Defendants had the ability to exercise control

22  over and did control a person or persons who have each violated Section 14(a) and SEC Rule

23  14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

24  persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

25  and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be

26  irreparably harmed.

27       WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class,

28  and against the Defendants, as follows:

A.   Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.   Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Acquisition;

C.   Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

D.   Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Rentech unitholders;

E.   Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

F.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.   Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury on all issues which can be heard by a jury.

Dated: October 6, 2015

BRODSKY & SMITH, LLC


By: _____
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:   (877) 534-2590
Facsimile:    (310) 247-0160
*Attorneys for Plaintiff*

- 37 -
CLASS ACTION COMPLAINT