Evan J. Smith
BRODSKY & SMITH, LLC
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE SLOAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RENTECH NITROGEN PARTNERS, LP; MICHAEL S. BURKE; JOHN H. DIESCH; JAMES F. DIETZ; KEITH B. FORMAN; MICHAEL F. RAY; RENTECH NITROGEN GP, LLC; CVR PARTNERS, LP; LUX MERGER SUB 1, LLC; AND LUX MERGER SUB 2, LLC,<br><br>Defendants. | Case No. 2:15-cv-07818-GW-MRW<br><br>Assigned To The Honorable George H. Wu<br><br>CLASS ACTION<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date:  June 16, 2016<br>Time:  8:30 a.m.<br>Place:  Courtroom 10 |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................... 1

III.  SUMMARY OF THE SETTLEMENT ........................................................ 4

IV.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY
      APPROVAL ........................................................................................ 8

      A. Standards for Preliminary Approval ................................................ 8

      B. The Proposed Settlement Merits Preliminary Approval ..................... 11

         1. The Parties Could Identify the Strengths and Weaknesses of Their
            Cases ........................................................................................ 11

         2. The Settlement Appropriately Balances the Risks of Litigation and the
            Benefit    of a Certain Recovery for the Class ................................ 12

            a.  Information Concerning Morgan Stanley's Analysis ................... 14

            b.  Information Regarding the Background of the Merger ................. 17

            c.  Information Regarding Management's Projections ...................... 18

         3. The Recommendation of Experienced Counsel Heavily Weight in
            Favor of Approval of the Settlement ............................................ 19

V.    CERTIFICATION OF THE CLASS IS APPROPRIATE ............................. 19

      A. The Proposed Class Satisfies the Prerequisites of Rule 23(a) ............. 20

         1. The Class Is So Numerous that Joinder of All Class Members Is
            Impracticable ............................................................................ 21

         2. Questions of Law and Fact Are Common to Members of the Class .. 22

         3. Plaintiff's Claims Are Typical .................................................... 23

         4. Plaintiff Will Fairly And Adequately Protect the Interests of the Class
            ................................................................................................ 25

      B. The Proposed Class Satisfies Rules 23(b)(1) and 23(b)(2) .................. 25

VI.   THE PROPOSED NOTICE PROGRAM IS APPROPRIATE ........................ 27

VII.  PROPOSED SCHEDULE OF EVENTS .................................................... 28

VIII. CONCLUSION .................................................................................. 29

1
2
3

## TABLE OF AUTHORITIES

4

**Cases**

5     *A & J Deutscher Family Fund v. Bullard*,
         No. CV 85-1850-PAR, 1986 WL 14903 (C.D. Cal. Sept. 22, 1986) .................24
6
      *Adam v. Silicon Valley Bancshares*,
7        884 F. Supp. 1398 (N.D. Cal. 1995) ....................................................................24

8     *Alvidres v. Countrywide Fin. Corp.*,
         No.CV07-5810-RJK(CTX), 2008 WL 1766927 (C.D. Cal. Apr. 16, 2008) .......26
9
      *Amchem Prods. v. Windsor*,
10       521 U.S. 591 (1997) ....................................................................................20, 26

11    *Armstrong v. Bd. of Sch. Dirs.*,
         616 F.2d 305 (7th Cir. 1980) ........................................................................9, 10
12
      *Armstrong v. Davis*,
13       275 F.3d 849 (9th Cir. 2001) ...........................................................................24

14    *Arnold v. Soc'y for Sav. Bancorp*,
         650 A.2d 1270 (Del. 1994) ........................................................................14, 17
15
      *Arnold v. United Artists Theatre Circuit*,
16       158 F.R.D. 439 (N.D. Cal. 1994) ....................................................................21

17    *Ballard v. Equifax Check Servs., Inc.*,
         186 F.R.D. 589 (E.D. Cal. 1999) ....................................................................23
18
      *Basic Inc. v. Levinson*,
19       485 U.S. 224 (1988) .........................................................................................20

20    *Blackie v. Barrack*,
         524 F.2d 891 (9th Cir. 1975) ..........................................................................20
21
      *Boyd v. Bechtel Corp.*,
22       485 F. Supp. 610 (N.D. Cal. 1979) .............................................................12, 19

23    *Cirrus Logic Sec.*,
         155 F.R.D. 654 (N.D. Cal. 1994) ................................................................21, 24
24
      *Donohue v. Apple, Inc.*,
25       871 F.Supp.2d 913 (N.D. Cal. 2012) ...............................................................14

26    *Ehrheart v. Verizon Wireless*,
         609 F.3d 590 (3d Cir. 2010) ..............................................................................8
27
      *Felzen v. Andreas*,
28       134 F.3d 873 (7th Cir. 1998) ..............................................................................9

*Fletcher v. A.J. Indus., Inc.*,
  266 Cal. App. 2d 313 (1968) ............................................................... 17

*Freedman v. La.-Pac. Corp.*,
  922 F. Supp. 377 (D. Or. 1996) .......................................................... 23

*Freedman v. Rest. Assocs. Indus., Inc.*,
  C.A. No. 9212, 1990 Del. Ch. LEXIS 142 (Del. Ch. Sept. 19, 1990) ............... 13

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................... 11, 22, 23

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ............................................................. 24

*Harris v. Palm Springs Alpine Estates, Inc.*,
  329 F.2d 909 (9th Cir. 1964) ......................................................... 20, 21

*Harry M. v. Pa. Dep't of Pub. Welfare*,
  No. 1:10-cv-922, 2013 U.S. Dist. LEXIS 48758 (M.D. Pa. Apr. 4, 2013) ........... 9

*Haywood v. Barnes*,
  109 F.R.D. 568 (E.D.N.C. 1986) ........................................................ 22

*Hernandez v. Alexander*,
  152 F.R.D. 192 (D. Nev. 1993) .......................................................... 21

*In re Adobe Sys., Inc. Sec. Litig.*,
  139 F.R.D. 150 (N.D. Cal. 1991) ....................................................... 20

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
  140 F.R.D. 425 (D. Ariz. 1992) ........................................................ 23

*In re Asbestos Sch. Litig.*,
  104 F.R.D. 422 (E.D. Pa. 1984) ........................................................ 22

*In re Emerging Commc'ns, Inc. S'holder Litig.*,
  No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) ..................... 19

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ............................................................ 8, 9

*In re Ikon Office Solutions*,
  191 F.R.D. 457 (E.D. Pa. 2000) ........................................................ 26

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ................................................... 11, 12, 13

*In re NASDAQ Market-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ......................................................... 9

*In re Netsmart Techs. Inc. S'holders Litig*,
  924 A.2d 171(Del. Ch. 2007) .......................................................... 14

iii

*In re NVIDIA Corp. Derivative Litig.*,
  No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. 2008) ..................... 8

*In re Pure Res., Inc. S'holders Litig*,
  808 A.2d 421, 448 (Del. Ch. 2002); ................................................... 13, 14, 16

*In re Staples, Inc. S'holders Litig.*,
  792 A.2d 934 (Del. Ch. 2001) ...................................................................... 16

*In re Traffic Executive Ass'n - E. R.R.*,
  27 F.2d 631 (2d Cir. 1980) ............................................................................ 10

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*,
  122 F.R.D. 251 (C.D. Cal. 1988) ........................................................ 21, 23, 25

*J. I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ...................................................................................... 20

*Kirkorian v. Borelli*,
  695 F. Supp. 446 (N.D. Cal. 1988) ............................................................... 19

*Laborers Local 235 Benefit Funds v. Starent Networks, Corp.*,
  No. 5002-CC, 2009 WL 4725866 (Del. Ch. Nov. 18, 2009) .......................... 15

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) ........................................................................ 25

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ...................................................................... 12

*Lubin v. Sybedon Corp.*,
  688 F. Supp. 1425 (S.D. Cal. 1988) .............................................................. 25

*Mersay v. First Republic Corp.*,
  43 F.R.D. 465 (S.D.N.Y. 1968) .................................................................... 24

*Nagy v. Bistricer*,
  770 A.2d 43 (Del. Ch. 2000) ........................................................................ 17

*Neal v. Alabama By-Prods. Corp.*,
  No. 8282, 1990 WL 109243 (Del. Ch. Aug. 1, 1990) .................................... 15

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. Cal. 2015) ............................................................... 13

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) .................................................................. 11, 12

*Perez-Funez v. Dist. Dir., I.N.S.*,
  611 F. Supp. 990 (C.D. Cal. 1984) ............................................................... 21

*Rodriguez v. Carlson*,
  166 F.R.D. 465 (E.D. Wash. 1996) ............................................................... 22

iv

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir.1992),
  *cert. denied*, 506 U.S. 1051 (1993) .................................................................23

*Safety Components Int'l, Inc. Sec. Litig.*,
  166 F. Supp. 2d 72 (D.N.J. 2001) ....................................................................12

*Schaefer v. Overland Express Family of Funds*,
  169 F.R.D. 124 (S.D. Cal. 1996).................................................21, 23, 24, 25

*Schneider v. Traweek*,
  No. CV 88-0905 RG (KX), 1990 WL 132716 (C.D. Cal. July 31, 1990)....20, 22,
  23

*Schwartz v. Harp*,
  108 F.R.D. 279 (C.D. Cal. 1985) ...............................................................21, 24

*Stolz v. United Bhd. of Carpenters & Joiners, Local Union No. 971*,
  620 F. Supp. 396 (D. Nev. 1985) .....................................................................24

*Stroud v. Grace*,
  606 A.2d 75 (Del. 1992). ...................................................................................13

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993)...............................................................................11

*Wehner v. Syntex Corp.*,
  117 F.R.D. 641 (N.D. Cal. 1987) ......................................................................21

*Weinberger v. Jackson*,
  102 F.R.D. 839 (N.D. Cal. 1984) ......................................................................25

*Williams v. First Nat'l Bank*,
  216 U.S. 582 (1910) ............................................................................................8

*Yamner v. Boich*,
  No. C-92-20597 RPA, 1994 WL 514035 (N.D. Cal. Sept. 15, 1994) ................22

*Yslava v. Hughes Aircraft Co.*,
  845 F. Supp. 705 (D. Ariz. 1993).....................................................................22

**Other Authorities**

James Wm. Moore, *Moore's Federal Practice* §23.85[3] (3d ed. 1999)...............11

Damodaran, Aswath, *Damodaran on Valuation*. 2nd ed.  Hoboken, NJ: John Wiley
  & Sons, 2006. p. 10 ...........................................................................................15

Melvin Aron Eisenberg & James D. Cox, *Corporations and Other Business
  Organizations* 1031 (10th ed. 2011) ................................................................13

**Constitutional Provisions**

Fed. R. Civ. P. 23(b)(2) .......................................................................................27

v

Federal Rule of Civil Procedure 23(a)(2) ........................................................22, 23

Rule 23 ....................................................................................20, 21, 23, 28

Rule 23(a)(1) ........................................................................................21, 22

Rule 23(a)(3) ........................................................................................23, 24

Rule 23(a)(4) ..............................................................................................25

Rule 23(b) ....................................................................................................25

Rule 23(b)(1)(A) ..........................................................................................26

Rule 23(e) ....................................................................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Parties have entered into the Stipulation that will result in a global resolution of the matters alleged in the above-captioned action.[1]  Plaintiff submits this memorandum in support of his motion for entry of an order: (i) preliminarily approving the Settlement set forth in the Stipulation; (ii) preliminarily certifying the Class; (iii) authorizing the form and manner of notice to be sent to the Class advising them of the Settlement, Plaintiff's Counsel's fee and expense application, and their rights with respect thereto; and (iv) scheduling a hearing to consider final approval of the Settlement.[2]

For the reasons set forth herein, Plaintiff respectfully urges the Court to enter the [Proposed] Order Preliminarily Approving the Settlement and Providing for Notice ("Order"), attached as Exhibit B to the Stipulation (a copy of which is filed separately herewith).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This is a class action against defendant Rentech Nitrogen Partners, LP ("Rentech Nitrogen" or the "Company"), Rentech Nitrogen GP, LLC ("Rentech Nitrogen GP"), Lux Merger Sub 1 LLC, Lux Merger Sub 2 LLC, CVR Partners, LP ("CVR Partners") and certain individual defendants.  The action challenges the merger between Rentech Nitrogen and CVR Partners. *See* Smith Decl. at ¶3.

On August 9, 2015, Rentech Nitrogen announced that it had entered into a Merger Agreement, pursuant to which (1) Lux Merger Sub 1 LLC, a wholly owned subsidiary of CVR Partners will merge with and into Rentech Nitrogen GP, with

---

[1] All capitalized terms used herein are defined in the Stipulation, a copy of which is attached as Exhibit 1 to the Declaration of Evan J. Smith in Support of Preliminary Approval (hereinafter "Smith Decl.")

[2] Defendants do not oppose this Motion, however an agreement as to fees has not yet been reached.

Rentech Nitrogen GP continuing as the surviving entity as a wholly owned subsidiary of CVR Partners; and (2) Lux Merger Sub 2 LLC, a wholly owned subsidiary of CVR Partners, will merge with and into Rentech Nitrogen, with Rentech Nitrogen continuing as the surviving entity as a subsidiary of CVR Partners. *Id.* at ¶4.  Under the terms of the merger agreement, each holder of common units representing limited partner interests in Rentech Nitrogen eligible to receive consideration would receive 1.04 common units and $2.57 in cash, without interest, for each Rentech Nitrogen common unit (the "Merger").  *Id.*

Following the announcement of the Merger, on August 28, 2015, Mike Mustard filed a class action lawsuit in the Court of Chancery of the State of Delaware, entitled *Mustard v. Burke, et al.,* Case No. 11446-CB (the "Delaware Action").  In connection with its proposed meeting of unitholders, CVR Partners filed a Form S-4 Registration Statement (the "Registration Statement") with the U.S. Securities and Exchange Commission (the "SEC") on September 17, 2015.  On October 6, 2015, Jesse Sloan (the "California Plaintiff") filed a class action lawsuit in this Court, entitled *Sloan v. Rentech Nitrogen Partners, LP, et al.*, Case No. 2:15-cv-07818-GW-MRW (the "California Action," and, together with the Delaware Action, the "Actions").  *Id.* at ¶5.

The Actions were filed on behalf of the public unitholders of Rentech Nitrogen against Rentech Nitrogen, Rentech Nitrogen GP, members of the Board of Directors (the "Board" or the "Individual Defendants"), CVR Partners, Lux Merger Sub 1 LLC, and Lux Merger 2 LLC, among others (collectively, "Defendants").  The Actions alleged, *inter alia*, that by reason of Defendants' conduct, the named plaintiffs and the class members had suffered and would suffer irreparable harm for which they had no adequate remedy at law, and requested that the Court grant appropriate relief for such alleged harm.  *Id.* at ¶6.

On November 5, 2015, the Parties entered into a stipulated confidentiality

agreement, which was entered by the Court on November 6, 2015.  Pursuant to agreement reached between the Parties, Defendants produced, and the California Plaintiff reviewed, nearly 8,000 pages of confidential non-public documents.  The California Plaintiff also reviewed publicly available documents, including Rentech Nitrogen's SEC filings, trading history, and news reports.  On November 18, 2015, the California Plaintiff conducted the deposition of Dan Cohrs, Rentech Nitrogen's Chief Financial Officer.  On December 1, 2015, the California Plaintiff conducted the deposition of a representative of Morgan Stanley, financial adviser to Rentech Nitrogen in connection with the Merger.  The California Plaintiff also conferred with a financial expert engaged for the purposes of analyzing the Merger, the fairness of the Merger, and the adequacy of the disclosures made by Defendants in connection with soliciting the votes of the Company's unitholders on the Merger.  *Id.* at ¶7.

Plaintiffs' Counsel and counsel for Defendants in the Actions engaged in extensive arms' length negotiations concerning Plaintiffs' claims and the possible settlement of the Actions.  As a result of such negotiations, on February 1, 2016, the Parties hereto entered into a Memorandum of Understanding (the "MOU") containing the terms for the Parties' agreement-in-principle to resolve the Actions. The MOU was negotiated and executed before any negotiations regarding Plaintiffs' Counsel's anticipated application for fees and expenses.  Pursuant to the terms of the MOU, Defendants produced and the California Plaintiff reviewed additional confidential non-public documents relating to the Merger.  Among other things, the MOU set forth the Parties' agreement-in-principle that, in consideration for the full and final settlement and dismissal with prejudice of the Actions and the release of any and all Released Claims, Defendants would make additional disclosures (the "Disclosures") to the Registration Statement in a Form 8-K to be filed with the SEC as soon as practicable.  A copy of the 8-K showing the Disclosures to which the Parties agreed in settlement of the Actions is attached as Exhibit A to the Stipulation.

Plaintiffs' Counsel proposed, reviewed, commented on, and approved the Disclosures. Defendants agree that the pendency of the Actions and the efforts of Plaintiffs' Counsel were the sole cause for the dissemination of the Disclosures. Discovery is now complete, and Plaintiffs have confirmed the fairness, adequacy, and reasonableness of the Settlement. *Id.* at ¶8.

On February 15, 2016, at a special meeting of Rentech Nitrogen's unitholders, the unitholders voted to adopt the Merger. The Merger was thereafter consummated on April 1, 2016. *Id.* at ¶9.

## III. SUMMARY OF THE SETTLEMENT

As a result of, among other things, the prosecution of the Action and discussions between and among the Parties, it is agreed that in consideration for the full and final settlement and release of all Released Claims (as defined in the Stipulation) by Plaintiff and all members of the Class and the dismissal with prejudice of the Action, Defendants agreed to and did cause Rentech Nitrogen to file with the SEC on February 2, 2016 the Settlement 8-K, attached as Exhibit A to the Stipulation, containing the Supplemental Disclosures. The Supplemental Disclosures provided information to Rentech Nitrogen unitholders in advance of the vote concerning, in part, the following (*Id.* at ¶10):

- Information regarding the Background of the Transaction, including:
  - The negotiations of the terms of the Merger, including the reason for the Board's decision to accept the expense reimbursement and termination fee requested by CVR Partners.
- Information regarding the Financial Opinion of Morgan Stanley, including:
  - With respect to Morgan Stanley's Discounted Cash Flow Analysis, an explanation as to how projected free cash flows were calculated, as well as how the cost of equity and cost of debt were calculated, and an explanation as to why Adjusted EBITDA (instead of EBITDA) was used to estimate equity values per CVR Partners' common unit;

- o   With respect to Morgan Stanley's Distribution Discount Analysis, inclusion of the cost of equity figures used for both Rentech Nitrogen and CVR Partners;

- o   With respect to Morgan Stanley's Pro Forma Distributable Cash Per Unit Accretion/Dilution Analysis, the inclusion of the following chart: and

| Year | Accretion / (Dilution) to Rentech Nitrogen DPU without reinvestment (%) | Accretion / (Dilution) to Rentech Nitrogen DPU with reinvestment (%) | Accretion / (Dilution) to CVR Partners DPU (%) |
|---|---|---|---|
| 2016 | 4.9 | 9.2 | 1.9 |
| 2017 | (23.7) | (21.0) | 34.6 |
| 2018 | (0.0) | 4.3 | 7.5 |
| 2019 | (23.2) | (20.8) | 28.7 |

- o   With respect to Morgan Stanley's Relative Contribution Analysis, the reason for using EBITDA with respect to Rentech Nitrogen but Adjusted EBITDA in the case of CVR Partners 8/4 Projections.

- • Information regarding Management's Projections, including the following additions to the chart below (additions highlighted):

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Daily production** | | | | | |
| UAN (short tons) | 775 | 753 | 848 | 789 | 850 |
| Ammonia (short tons) | 921 | 911 | 1,058 | 984 | 1,060 |
| Ammonia available for sale (tons) | 561 | 477 | 571 | 531 | 572 |
| **EBITDA (1)(2) ($ in millions)** | $109.6 | $ 88.1(2) | $111.2 | $ 92.0 | $123.6 |
| **Cash available for distribution ($ in millions)** | $ 73.2 | $ 50.3 | $ 79.2 | $ 53.8 | $ 91.2 |
| **Cash available for distribution per unit** | $ 1.88 | $ 1.29 | $ 2.03 | $ 1.38 | $ 2.34 |
| **Operating income ($ in millions)** | $ 91.3 | $ 70.3 | $ 93.1 | $ 73.5 | $104.7 |
| **Depreciation ($ in millions)** | $ 18.3 | $ 17.8 | $ 18.2 | $ 18.5 | $ 18.9 |
| **Change in net working capital ($ in millions)** | $(11.3) | $ (9.7) | $ (1.4) | $ 1.7 | $ (0.7) |
| **Capital expenditures ($ in millions)** | $(30.3) | $(25.7) | $(10.0) | $(16.0) | $(10.0) |
| **Taxes** | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) |
| **Turnaround expense ($ in millions)** | — | $ 5.0 | — | $ 6.0 | — |
| **Key assumptions** | | | | | |
| *Price* | | | | | |
| UAN ($/short ton) | 255 | 246 | 255 | 257 | 273 |
| Ammonia ($/short ton) | 542 | 516 | 513 | 512 | 553 |

(1) EBITDA is defined as net income (loss) plus or less net interest expense, depreciation and amortization, income tax expenses or benefit, other income or expense and goodwill and asset impairments.

(2) Adjusted EBITDA is expected to be $103.3 million in 2016. Adjusted EBITDA is defined as EBITDA as further adjusted for turnaround expenses and sales volume impact due to turnaround. In 2016, the turnaround adjustment is $15.2 million. $5.0 million of this adjustment constitutes turnaround expenses, and the remaining $10.2 million represents sales volume impact due to turnaround. Every two to three years, Rentech Nitrogen closes its facilities for planned maintenance, which is referred to as a "turnaround," and suspends production during these turnaround periods. Sales volume impact due to turnaround represents the expected margins if production had occurred at normal rates during these planned downtime periods.

(3) Rentech Nitrogen calculates cash available for distribution as EBITDA plus non-cash compensation expense and distribution of cash reserves, less the sum of maintenance capital expenditures not funded by financing proceeds, net interest expense and other debt service and cash reserved for working capital purposes. Distribution of cash reserves represents a discretionary distribution to unitholders from cash on the balance sheet. Rentech Nitrogen has distributed cash reserves in the past when the cash balance is high, and there is sufficient cash on the balance sheet to fund near-term working capital, although Rentech Nitrogen has also distributed cash reserves under other circumstances. Cash is put into reserves, rather than distributed to unitholders, when management determines that additional cash may be necessary in the near term to fund working capital or maintenance capital expenditures.

Without admitting any wrongdoing or liability whatsoever, and without conceding the materiality of any of the Supplemental Disclosures, Defendants acknowledge that Plaintiff's claims, and the prosecution thereof, caused Rentech Nitrogen to make the Supplemental Disclosures on February 2, 2016.  *Id.* at ¶8.

As defined in the Stipulation, the proposed Class consists of all record and beneficial owners of Rentech Nitrogen common units who owned or held Rentech Nitrogen common units at any time during the period beginning on August 9, 2015 through April 1, 2016, including any and all of their respective successors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns, or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them (the "Class," to be composed of "Class Members").  Excluded from the Class are Defendants, members of the

immediate family of any Defendant, any entity in which a Defendant has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded person. *See* Stipulation, attached as Exhibit 1 to Smith Decl.

The Parties agreed to seek entry of an Order and Final Judgment, substantially in the form attached to the Stipulation as Exhibit D, dismissing the Actions with prejudice and without fees or costs except as expressly provided herein. The Order and Final Judgment, among other things, releases and fully and completely discharges and dismisses with prejudice and on the merits all known and unknown claims of every nature and description whatsoever against any of the Released Parties that have been, could have been, or in the future can or might be asserted by Plaintiffs or any member of the Class in their capacity as unitholders, in any forum or proceeding, including class, derivative, individual, or other claims, whether state, federal, or foreign, common law, statutory, or regulatory, including, without limitation, claims under the federal securities or antitrust laws, arising out of, related to, or concerning (i) the Merger, the Merger Agreement, or any element, term, or condition of the Merger or the Merger Agreement, (ii) the Defendants' consideration, evaluation, or approval of the Merger, (iii) the disclosures or any public filings, periodic reports, press releases, proxy statements, or other statements issued, made available, filed, or otherwise disclosed or communicated related to the Merger, including any amendments thereto, (iv) any vote on the Merger, (v) the consideration offered, paid, or received by any Released Person or Class member in connection with the Merger, (vi) payments to the Company's directors and executive officers in connection with the Merger, (vii) any alleged aiding and abetting of any of the foregoing, and (viii) any fees, costs, or expenses incurred in prosecuting, defending, or settling the Actions.

Released Parties include Defendants and their respective predecessors, successors in interest, parents, subsidiaries, affiliates, representatives, agents,

trustees, executors, heirs, spouses, marital communities, assigns, or transferees and any person or entity acting for or on behalf of any of them and each of them, and each of their predecessors, successors-in-interest, parents, subsidiaries, affiliates, representatives, agents, trustees, executors, heirs, spouses, marital communities, assigns, or transferees and any person or entity acting for or on behalf of any of them and each of them (including, without limitation, any investment bankers, accountants, insurers, reinsurers, or attorneys and any past, present, or future officers, directors, and employees of any of them).

## IV.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

At the Settlement Hearing, the Court will have before it extensive papers submitted in support of approval of the proposed Settlement and will be asked to make a determination as to whether the Settlement is fair, reasonable, and adequate under all of the circumstances surrounding the litigation.  At this juncture, however, the Parties request only that the Court grant preliminary approval of the Settlement.

### A. Standards for Preliminary Approval

Federal courts favor settlement of class action litigation, "particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation" *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *2 (N.D. Cal. 2008) (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)); *see also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).[3]  There is an "especially strong" presumption in favor of approval of voluntary settlements in "'class actions . . . where substantial judicial resources can be conserved by avoiding formal litigation.'" *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010)

---

[3] Unless otherwise noted, all citations, internal quotations, and footnotes are omitted, and emphasis is added.

(quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)).

The procedure for review of a proposed class action settlement is well established:

> District court review of a class action settlement proposal is a two-step process. The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. *Manual for Complex Litigation* §1.46, at 53-55 (West 1977). If the district court finds a settlement proposal "within the range of possible approval," it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard. The goal of the fairness hearing is to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is 'fair, reasonable, and adequate.' *Manual for Complex Litigation* at 57. On the basis of all information available to him, the trial judge must decide whether or not to approve the proposed settlement.

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980) (footnote omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

To grant preliminary approval, the Court need only conclude that a settlement of the claims against the Defendants on the agreed upon terms is within the range of possible approval for the purposes of providing notice and holding a future fairness hearing. *See Harry M. v. Pa. Dep't of Pub. Welfare*, No. 1:10-cv-922, 2013 WL 1386286, at *1 (M.D. Pa. Apr. 4, 2013) (the Court need only determine whether the proposed Settlement "appears to be the product of 'serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval.'") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).[4]

---

[4] As the *Manual for Complex Litigation* explains: "If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives

Indeed, courts specifically have held that the granting of permission to send out a notice of settlement and hearing thereon, "is not tantamount to a finding that the settlement is fair and reasonable.  It is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re Traffic Executive Ass'n - E. R.R.*, 627 F.2d 631, 634 (2d Cir. 1980) (citing *Manual for Complex Litigation* §1.46, at 55 n.10 (1977)); *Armstrong*, 616 F.2d at 314 n.13.

Plaintiff submits that this Court can make such a determination of "probable cause."  Here, notwithstanding Plaintiff's Counsel's belief that the claims asserted have legal merit, there are a number of substantive and procedural questions that pose significant hurdles to securing a more meaningful recovery for the Class, and indicate that the Settlement should be approved.  In fact, Plaintiff believes that this Settlement obtained much of the relief that Plaintiff sought to obtain, as it provided additional information with respect to the Merger that would not have been disclosed absent the litigation and Settlement thereof.  Plaintiff further believes that the Supplemental Disclosures provided Rentech Nitrogen's unitholders with material information that enabled them to make a more fully informed vote on the Merger.

At this point, the Court need not answer the ultimate question: whether the Settlement is fair, reasonable and adequate.  The Court is only being asked to permit notice of the terms of the Settlement to be sent to the Class, and to schedule a hearing, pursuant to Rule 23(e), to consider any views expressed by Class Members as to the fairness of the Settlement.  5 James Wm. Moore, *Moore's Federal Practice*

---

or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement."  MANUAL FOR COMPLEX LITIGATION §30.41, at 237 (3d ed. 1995).

§23.85[3], at 23-353 to 23-354 (3d ed. 1999).   Accordingly, for the reasons discussed *supra*, the proposed Settlement should be preliminarily approved.

**B. The Proposed Settlement Merits Preliminary Approval**

Reference to the factors considered by courts in granting final approval of class action settlements lends support to the Parties' belief that the proposed Settlement is within the range of possible approval.  In *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982), the Ninth Circuit set out the factors that the trial court should consider in assessing whether a proposed settlement is fair, reasonable and adequate.

> Although Rule 23(e) is silent respecting the standard by which a proposed settlement is to be evaluated, the universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable. The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following:  the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id*. at 625 (citations omitted). *Accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

**1.  The Parties Could Identify the Strengths and Weaknesses of Their Cases**

The stage of the proceedings is one of the factors that courts consider in determining the fairness, reasonableness and adequacy of a settlement.  *Hanlon*, 150 F.3d at 1026; *Torrisi*, 8 F.3d at 1375.  However, as the Ninth Circuit recently reiterated: "'in the context of class action settlements, "formal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an informed decision about settlement.'"  *In re Mego Fin.*

*Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).

Here, Plaintiff conducted an extensive investigation that included review of thousands of pages of confidential, non-public documents, the depositions of Dan Cohrs, Rentech Nitrogen's Chief Financial Officer on November 18, 2015, and Morgan Stanley, financial advisor to Rentech Nitrogen on December 1, 2015. Plaintiff also reviewed all relevant Rentech Nitrogen SEC filings, analyst reports and press releases.  Plaintiff's Counsel also worked with a financial expert with respect to the issues in the Action.  Smith Decl. ¶ 7.

The Settlement was negotiated at arm's length and in good faith by the Parties, and was reached voluntarily based upon adequate information and sufficient discovery and after consultation with experienced legal counsel.  After conducting thorough discovery, Plaintiff's Counsel understood the strengths and weaknesses of Plaintiff's case and had sufficient information to support a decision regarding the fairness of the Settlement.

### 2. The Settlement Appropriately Balances the Risks of Litigation and the Benefit of a Certain Recovery for the Class

An evaluation of the benefits provided by the Supplemental Disclosures must be tempered by recognition that any compromise involves concessions on the part of all of the Parties.  Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice*, 688 F.2d at 624 (citations omitted); *see also Mego Fin.*, 213 F.3d at 458; *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 618 (N.D. Cal. 1979); *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 89 (D.N.J. 2001) ("The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" (citation omitted)).  The immediacy and certainty of a recovery is a factor for the court to balance in determining whether

the proposed settlement is fair, adequate, and reasonable.  *E.g.*, *Mego Fin.*, 213 F.3d at 458.

Here, the Supplemental Disclosures provided a benefit to the Class, and the Settlement solidifies a large portion of the relief sought by Plaintiff by providing significant material information that enhanced each unitholder's ability to make a fully informed decision on the Merger.  Regarding Plaintiff's disclosure claims herein, Plaintiff's diligent investigative efforts and independent financial analysis led Plaintiff to believe that Morgan Stanley had omitted several elements of value from its analysis of the fairness of the consideration that the Company agreed to provide to Rentech Nitrogen unitholders in the Merger.  Plaintiff believes that the proposed Settlement, in which Rentech Nitrogen agreed to remedy this claimed disclosure deficiency in the Supplemental Disclosures, provided full disclosure for Rentech Nitrogen unitholders prior to their decision to vote.

Under Delaware law,[5] shareholders are entitled to the full and accurate disclosure of all material facts before making a decision as to a significant corporate transaction.  *Stroud v. Grace*, 606 A.2d 75, 84-85 (Del. 1992).  Moreover, once a company makes a disclosure, it must do so candidly and truthfully.  *Freedman v. Rest. Assocs. Indus., Inc.*, C.A. No. 9212, 1990 WL 135923, at *8 (Del. Ch. Sept. 19, 1990) (purpose of transaction had to be disclosed "truthfully and candidly").  Thus, "[w]hen a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."  *In re Pure Res., Inc. S'holders Litig*, 808 A.2d 421, 448 (Del. Ch. 2002); *see also Arnold*

---

[5]  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1059 (9th Cir. Cal. 2015) ("'While the present case does not directly involve the application of Delaware law, Delaware has been described aptly as 'by far the most important corporate jurisdiction[.]'") (quoting Melvin Aron Eisenberg & James D. Cox, *Corporations and Other Business Organizations* 1031 (10th ed. 2011)).

*v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1280 (Del. 1994) (partial disclosure of historical events leading up to merger triggered duty to disclose).

### a. Information Concerning Morgan Stanley's Analysis

The Supplemental Disclosures provided previously-omitted information, which enabled Rentech's unitholders to make their own assessment of what weight to place on the fairness opinion in deciding whether to tender their shares. Because the valuation exercises performed in the fairness opinion of a financial advisor like Morgan Stanley figure prominently in a unitholder's decision as to how to vote on a transaction, the information regarding Morgan Stanley's valuation analyses was material to Rentech's unitholders. For this reason, Plaintiff retained a financial advisor to consult with respect to the financial analyses conducted by Morgan Stanley and the justification offered in support of the deal. As a result of this collaboration, Plaintiff was able to address material omissions by the Supplemental Disclosures. Plaintiff was successful in obtaining material disclosures regarding the financial analyses performed by Morgan Stanley in rendering its fairness opinion for this Merger which were relied upon by Rentech Nitrogen's unitholders. As a general rule:

> [W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the board as to how to vote . . . rely.

*In re Netsmart Techs. Inc. S'holders Litig*, 924 A.2d 171, 203-204 (Del. Ch. 2007) (quotation and footnote omitted); *see also Pure Res.*, 808 A.2d at 449 ("The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttress that result."). "[I]nvestment bankers' analyses . . . usually address the most important issue to stockholders – the sufficiency of the

consideration being offered to them for their shares in a merger or tender offer." *Id*. at 449.

Specifically, the Supplemental Disclosures provided additional information regarding Morgan Stanley's Discounted Cash Flows Analysis, including an explanation as to how projected free cash flows, the cost of equity and cost of debt were calculated.[6]  The Supplemental Disclosures explained that Rentech Nitrogen's projected free cash flow was calculated as "operating income, plus depreciation and amortization, less change in net working capital, capital expenditures and taxes." Exhibit A to Stipulation.  It further revealed that Rentech Nitrogen's capital asset pricing model was 11.2% and its cost of debt was 7.5%, whereas CVR Partners was 10.2% and 6%, respectively.   The Supplemental Disclosures further explained that Adjusted EBITDA (instead of EBITDA) was used to estimate equity values per CVR Partners common unit because it provided "for a more representative comparison between CVR Partners and Rentech Nitrogen given the differences in their respective calculations of Adjusted EBITDA." Exhibit A to Stipulation. Similarly, with respect to Morgan Stanley's Distribution Discount Analysis, the Supplemental Disclosures included the value of the cost of equity figures used for both Rentech Nitrogen and CVR Partners.

This information is material because the Court and experts recognize that "the discounted cash flow analysis [is] arguably the most important valuation metric" for a company's stockholders. *Laborers Local 235 Benefit Funds v. Starent Networks, Corp.*, No. 5002-CC, 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009); s*ee also Neal v. Alabama By-Prods. Corp.*, No. 8282, 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990) ("[The DCF analysis] is considered by experts to be the preeminent

---

[6] A Discounted Cash Flow Analysis ("DCF") represents the present value of the forecasted cash flow stream of the subject entity.  A DCF analysis is widely used by financial professionals and is based upon the premise that "the value of an asset is the present value of the expected cash flow on the asset, discounted back at a rate that reflects the riskiness of these cash flows.  Damodaran, Aswath. *Damodaran on Valuation*. 2nd ed.  Hoboken, NJ: John Wiley & Sons, 2006. p. 10.

valuation methodology."). Stockholders, moreover, could not ascertain this information without the Supplemental Disclosures, which corrected these incomplete and partial disclosures. *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."); *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) ("[D]irectors must . . . avoid partial disclosures that create a materially misleading impression.").

Additionally, the Supplemental Disclosures revealed information regarding Morgan Stanley's Pro Forma Distributable Cash Per Unit Accretion/Dilution Analysis. The following chart was included as a result of the Supplemental Disclosures:

| Year | Accretion / (Dilution) to Rentech Nitrogen DPU without reinvestment (%) | Accretion / (Dilution) to Rentech Nitrogen DPU with reinvestment (%) | Accretion / (Dilution) to CVR Partners DPU (%) |
|---|---|---|---|
| 2016 | 4.9 | 9.2 | 1.9 |
| 2017 | (23.7) | (21.0) | 34.6 |
| 2018 | (0.0) | 4.3 | 7.5 |
| 2019 | (23.2) | (20.8) | 28.7 |

This additional information allowed Rentech Nitrogen stockholders to understand and evaluate whether the Merger would be dilutive or accretive to Rentech Nitrogen unitholders on a per share basis. Without this information, stockholders' ability to compare the Merger with potential alternatives would have been impaired. *See Netsmart*, 924 A.2d at 203-04 (finding that keys inputs and range of ultimate values generated by banker's analyses must be fairly disclosed).

With respect to Morgan Stanley's Relative Contribution Analysis, the Supplemental Disclosures included the reason for using Adjusted EBITDA with respect to Rentech Nitrogen but Adjusted EBITDA in the case of CVR Partners 8/4 Projections. The Supplemental Disclosures provided this previously omitted

information, which enabled Rentech Nitrogen's unitholders to make their own assessment of what weight to place on the fairness opinion in deciding how to vote on the Merger.  Because the valuation exercises performed in the fairness opinion of a financial advisor like Morgan Stanley figure prominently in a unitholder's decision as to how to vote on a transaction, the information regarding Morgan Stanley's valuation analyses was material to unitholders.  *Id.*

In sum, these disclosures equipped Rentech unitholders with additional information regarding the work performed by Morgan Stanley, Rentech's investment banker.  Courts have consistently held that disclosures such as these are material and beneficial to stockholders considering the sale of a company, and routinely approve settlements and/or award fees based on enhanced disclosures such as those obtained here.  *See, e.g.*, *Fletcher v. A.J. Indus., Inc.*, 266 Cal. App. 2d 313, 324-25 (1968) (stockholder suits where non-pecuniary benefits obtained serve an important consideration of public policy).

**b. Information Regarding the Background of the Merger**

Disclosures regarding the sales process leading to the Merger are material because they inform stockholders of the efforts taken by the Board to secure the highest price realistically achievable given the market for the Company.  *See, e.g., Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994) (holding that directors are obligated to provide "accurate, full, and fair characterization" of the "history leading up to the [m]erger…."); *see also Nagy v. Bistricer*, 770 A.2d 43, 60 (Del. Ch. 2000) (holding that shareholders are entitled to an accurate description of the "process" directors used "in coming to their decision to support the Merger").  Here, the Supplemental Disclosures provided information regarding the negotiations surrounding the terms of the Merger, including the reason for the Board's decision to accept the expense reimbursement and termination fee requested by CVR Partners.  Information regarding the sales process were material to Rentech

Nitrogen's unitholders because they provided detailed information regarding the extent of the solicitation and negotiation process undertaken by Morgan Stanley and Rentech Nitrogen.  Thus, unitholders had increased assurance that, in the context of a sale, they were realizing a value for their shares that was potentially the highest reasonably available.

### c.  Information Regarding Management's Projections

As a result of the Settlement, Defendants disclosed the following regarding management's projections:

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Daily production** | | | | | |
| UAN (short tons) | 775 | 753 | 848 | 789 | 850 |
| Ammonia (short tons) | 921 | 911 | 1,058 | 984 | 1,060 |
| Ammonia available for sale (tons) | 561 | 477 | 571 | 531 | 572 |
| **EBITDA (1)(2) ($ in millions)** | $109.6 | $ 88.1(2) | $111.2 | $ 92.0 | $123.6 |
| Cash available for distribution ($ in millions) | $ 73.2 | $ 50.3 | $ 79.2 | $ 53.8 | $ 91.2 |
| Cash available for distribution per unit | $ 1.88 | $ 1.29 | $ 2.03 | $ 1.38 | $ 2.34 |
| Operating income ($ in millions) | $ 91.3 | $ 70.3 | $ 93.1 | $ 73.5 | $104.7 |
| Depreciation ($ in millions) | $ 18.3 | $ 17.8 | $ 18.2 | $ 18.5 | $ 18.9 |
| Change in net working capital ($ in millions) | $(11.3) | $ (9.7) | $ (1.4) | $ 1.7 | $ (0.7) |
| Capital expenditures ($ in millions) | $(30.3) | $(25.7) | $(10.0) | $(16.0) | $(10.0) |
| Taxes | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) |
| Turnaround expense ($ in millions) | — | $ 5.0 | — | $ 6.0 | — |
| **Key assumptions** | | | | | |
| *Price* | | | | | |
| UAN ($/short ton) | 255 | 246 | 255 | 257 | 273 |
| Ammonia ($/short ton) | 542 | 516 | 513 | 512 | 553 |

(1)  EBITDA is defined as net income (loss) plus or less net interest expense, depreciation and amortization, income tax expenses or benefit, other income or expense and goodwill and asset impairments.

(2)  Adjusted EBITDA is expected to be $103.3 million in 2016. Adjusted EBITDA is defined as EBITDA as further adjusted for turnaround expenses and sales volume impact due to turnaround. In 2016, the turnaround adjustment is $15.2 million. $5.0 million of this adjustment constitutes turnaround expenses, and the remaining $10.2 million represents sales volume impact due to turnaround. Every two to three years, Rentech Nitrogen closes its facilities for planned maintenance, which is referred to as a "turnaround," and suspends production during these turnaround periods. Sales volume impact due to turnaround represents the expected margins if production had occurred at normal rates during these planned downtime periods.

(3)  Rentech Nitrogen calculates cash available for distribution as EBITDA plus non-cash compensation expense and distribution of cash reserves, less the sum of maintenance capital expenditures not funded by financing proceeds, net interest expense and other debt service and cash reserved for working capital purposes. Distribution of cash reserves represents a discretionary distribution to unitholders from cash on the balance sheet. Rentech Nitrogen has distributed cash reserves in the past when the cash balance is high, and there is sufficient cash on the balance sheet to fund near-term working capital, although Rentech Nitrogen has also distributed cash reserves under other circumstances. Cash is put into reserves, rather than distributed to unitholders, when management determines that additional cash may be necessary in the near term to fund working capital or maintenance capital expenditures.

These financial projections allowed Rentech Nitrogen's unitholders to not only understand the underlying projections Morgan Stanley used to prepare their

analyses and opinions, but also allowed unitholders to determine whether, based on these forecasts and various scenarios, it was in Rentech Nitrogen unitholders' best interests to support or oppose the Merger. Indeed, the Delaware Chancery Court explained in *In re Netsmart* that projections "are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or (as already discussed) market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." 924 A.2d at 203. *See, e.g., In re Emerging Commc'ns, Inc. S'holder Litig.*, No. 16415, 2004 Del. Ch. LEXIS 70, at *134 (Del. Ch. May 3, 2004) (finding projections "highly material" because knowledge of the projections "would have enabled the shareholders to understand [the company's] intrinsic worth and the extent of the market's undervaluation of their company.").

Therefore, the Settlement appropriately balances the risks of continued litigation and the benefit of a certain result for the proposed Class.

### 3. The Recommendation of Experienced Counsel Heavily Weight in Favor of Approval of the Settlement

Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class. *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) ("[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement"); *Boyd*, 485 F. Supp. at 622 (recommendations of plaintiffs' counsel should be given a presumption of reasonableness). Plaintiff's and Defendants' counsel fully support the Settlement and it is Plaintiff's Counsel's informed opinion that, given the uncertainty and substantial expense and risks involving continued litigation, the Settlement is fair, reasonable, and adequate and in the best interests of the Class.

## V.   CERTIFICATION OF THE CLASS IS APPROPRIATE

The benefits of the proposed Settlement can be realized only through certification of the Class. The United States Supreme Court has confirmed the

viability of certification of a settlement class. *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). Moreover, the Ninth Circuit and district courts within it have repeatedly endorsed the use of class action procedures to resolve claims under the federal securities laws. As one court has stated, "[t]he law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *Schneider v. Traweek*, No. CV 88-0905 RG (KX), 1990 WL 132716, at *6 (C.D. Cal. July 31, 1990). Courts recognize that any doubt as to the propriety of certification should be resolved in favor of certifying the class because denying class certification will almost certainly terminate the action and be detrimental to the members of the class. *Blackie v. Barrack*, 524 F.2d 891, 898-99 (9th Cir. 1975). "[C]lass actions commonly arise in securities fraud cases as the claims of separate investors are often too small to justify individual lawsuits, making class actions the only efficient deterrent against securities fraud. Accordingly, the Ninth Circuit and courts in this district hold a liberal view of class actions in securities litigation." *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 152-53 (N.D. Cal. 1991) (citing *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964)).

The Supreme Court has long recognized that private actions are an important enforcement mechanism to supplement governmental administrative regulation of the securities markets. "Private enforcement . . . provides a necessary supplement to [Securities and Exchange] Commission action," by both affording relief to those injured by violations of the securities laws and serving as a deterrent to future wrongdoing. *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

## A. The Proposed Class Satisfies the Prerequisites of Rule 23(a)

Rule 23(a) sets forth four prerequisites for certifying a class:

(1) [T]he class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties

1
2
are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

3   Fed. R. Civ. P. 23(a).  Thus, the Class should be certified once Plaintiff establishes

4   that his respective claims satisfy the four prerequisites of Rule 23(a) commonly

5   referred to as numerosity, commonality, typicality, and adequacy of representation.

6   *See Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 127 (S.D. Cal.

7   1996); *Hernandez v. Alexander*, 152 F.R.D. 192, 193 (D. Nev. 1993); *In re United*

8   *Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D. 251,

9   253 (C.D. Cal. 1988).  The proposed Class in this case easily satisfies each of these

10  prerequisites.

11
12
**1.  The Class Is So Numerous that Joinder of All Class Members Is Impracticable**

13  Rule 23(a)(1) requires that the class be so numerous that joinder of all class

14  members is "impracticable." Fed. R. Civ. P. 23(a)(1).  Impracticable does not mean

15  impossible, only that it would be difficult or inconvenient to join all members of the

16  class.  *Harris*, 329 F.2d at 913-14; *see also Wehner v. Syntex Corp.*, 117 F.R.D.

17  641, 643 (N.D. Cal. 1987).  There is no fixed number of class members which either

18  compels or precludes the certification of a class.  *Arnold v. United Artists Theatre*

19  *Circuit*, 158 F.R.D. 439, 448 (N.D. Cal. 1994); *see also In re Cirrus Logic Sec.*, 155

20  F.R.D. 654, 656 (N.D. Cal. 1994) (classes consisting of 25 members have been held

21  large enough to justify certification).  Additionally, the exact size of the class need

22  not be known so long as general knowledge and common sense indicate that the

23  class is large.  *Perez-Funez v. Dist. Dir., I.N.S.*, 611 F. Supp. 990, 995 (C.D. Cal.

24  1984); *see also Schwartz v. Harp*, 108 F.R.D. 279, 281-82 (C.D. Cal. 1985) ("A

25  failure to state the exact number in the proposed class does not defeat class

26  certification, and plaintiff's allegations plainly suffice to meet the numerosity

27  requirement of Rule 23." (citation omitted)).  Indeed, courts in this district have

28  assumed that the numerosity requirement is satisfied in securities cases involving

nationally traded stocks. *Yamner v. Boich*, No. C-92-20597 RPA, 1994 WL 514035, at *3 (N.D. Cal. Sept. 15, 1994).

As of July 31, 2015, there were over 38 million Rentech Nitrogen common stock issued and outstanding. Thus, the Class likely consists of hundreds, if not thousands, of members, which easily satisfies the numerosity requirement under Rule 23(a)(1).

### 2. Questions of Law and Fact Are Common to Members of the Class

Fed. R. Civ. P. 23(a)(2) requires that there be questions of law or fact common to the class. Like all the requirements of Rule 23(a), the commonality requirement is to be construed liberally: "'[T]hose courts that have focused on Rule 23(a)(2) have given it a permissive application so that common questions have been found to exist in a wide range of contexts.' The rule does not require all questions of law and fact to be common." *Rodriguez v. Carlson*, 166 F.R.D. 465, 472 (E.D. Wash. 1996) (quoting *Haywood v. Barnes*, 109 F.R.D. 568, 577 (E.D.N.C. 1986)); *see also Schneider*, 1990 WL 132716.

It is well-established that the commonality requirement is satisfied if the claims of the prospective class share even one central question of fact or law. *See, e.g.*, *Hanlon*, 150 F.3d at 1019-20. "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019; *see also Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 712 (D. Ariz. 1993) ("'A common question is one which arises from a "common nucleus of operative facts" regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants.'") (quoting *In re Asbestos Sch. Litig.*, 104 F.R.D. 422, 429 (E.D. Pa. 1984)).

Here, Plaintiff alleges that Defendants breached their fiduciary duties to Rentech Nitrogen unitholders in connection with the Merger. These central fact issues and their consequences are common to all Class members. *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 594-95 (E.D. Cal. 1999) ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2).") (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1017–18 (7th Cir.1992), *cert. denied*, 506 U.S. 1051 (1993)).

Moreover, there are questions of law and fact common to the Class, including whether the disclosures made by Rentech Nitrogen in connection with the Merger were adequate, whether the Individual Defendants breached their fiduciary duties to the members of the Class and whether the Plaintiff and the Class members were injured as a consequence of the Defendants' actions. Thus, the Class satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2).

### 3. Plaintiff's Claims Are Typical

Plaintiff's claims satisfy the typicality requirement of Rule 23(a)(3) if they arise from the same event or course of conduct that gives rise to claims of other Class members and the claims asserted are based on the same legal theory:

> The Plaintiffs have sufficiently demonstrated that the named class representatives' claims are typical of those of the entire "global" class because the "typicality" prerequisite of Rule 23(a)(3) is satisfied when all members of the class are victims of the same course of conduct.

*Schneider*, 1990 WL 132716, at *7; *see also Schaefer*, 169 F.R.D. at 128-29; *Freedman v. La.-Pac. Corp.*, 922 F. Supp. 377, 399 (D. Or. 1996); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 430 (D. Ariz. 1992); *United Energy*, 122 F.R.D. at 255-56. In *Hanlon*, the Ninth Circuit explained that "[u]nder [Rule 23's] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." 150 F.3d at 1020.

The purpose of the "typicality" requirement is to ensure that the named representatives' interests "align" with those of the class. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).   The test generally is "whether other members have the same or similar injury, whether the action is based on conduct that is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *A & J Deutscher Family Fund v. Bullard*, No. CV 85-1850-PAR, 1986 WL 14903, at *6 (C.D. Cal. Sept. 22, 1986) (citing *Schwartz*, 108 F.R.D. at 282); *see also Schaefer*, 169 F.R.D. at 128-29; *Cirrus*, 155 F.R.D. at 657.

Typicality does not require the representatives' claims to be identical to the class members' claims.  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct.").

Courts have held that Rule 23(a)(3) requires only that there be no express conflict between the representative party and the class "over the very issue in litigation" and that the representative's "interests are not antagonistic to those of the class." *Mersay v. First Republic Corp.*, 43 F.R.D. 465, 468-69 (S.D.N.Y. 1968); *accord Stolz v. United Bhd. of Carpenters & Joiners*, *Local Union No. 971*, 620 F. Supp. 396, 404 (D. Nev. 1985); *Adam v. Silicon Valley Bancshares*, 884 F. Supp. 1398 (N.D. Cal. 1995).

Here, the typicality requirement is satisfied because Plaintiff's claims and those of the Class members derive from the same set of operative facts.  Plaintiff's claims arise out of the same course of conduct, involve the same legal theories, do not raise divergent goals or interests, and are capable of class-wide resolution. There is no evidence that Plaintiff stands in any different posture than, or has any

conflicting position with, any other Rentech Nitrogen unitholder or Class member. All members of the Class were victims of the alleged common course of conduct by Defendants. As a result, Plaintiff's claims are typical of those of the Class.

### 4. Plaintiff Will Fairly And Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Courts have established a two-prong test for this requirement. *See, e.g.*, *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Schaefer*, 169 F.R.D. at 130; *United Energy*, 122 F.R.D. at 257. First, counsel for the class representative must be competent to undertake the particular litigation at hand. Second, there can be no antagonism or disabling conflict between the interests of the named class representative and the members of the class.

Plaintiff easily satisfies both prongs of the "adequacy" test here. First, Plaintiff has retained counsel experienced in prosecuting complex class litigation such as this case, and who have successfully prosecuted numerous class actions on behalf of investors in this District and across the country. There can be no legitimate dispute that Plaintiff's Counsel is capable of prosecuting this case and, as conclusive proof of their adequacy, they have secured this Settlement for the proposed Class.

The second requirement is also satisfied here because there is no antagonism between the proposed Class representative (i.e., Plaintiff) and the absent Class members. *See Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1461 (S.D. Cal. 1988); *Weinberger v. Jackson*, 102 F.R.D. 839, 844-5 (N.D. Cal. 1984). In fact, Plaintiff has the same claims as the members of the Class. *See infra*. Accordingly, the interests of the Class will be fairly and adequately protected. Fed. R. Civ. P. 23(a)(4).

### B. The Proposed Class Satisfies Rules 23(b)(1) and 23(b)(2)

In addition to demonstrating that the requirements of Rule 23(a) are met, Plaintiff must also establish that at least one subsection of Rule 23(b) is satisfied.

*Amchem Prod.*, 521 U.S. at 614.   Here, the proposed Class satisfies both Rules 23(b)(1) and 23(b)(2).

Under Rule 23(b)(1), a class may be certified if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

FED. R. CIV. P. 23(b)(1).   Thus, Rule 23(b)(1)(A) "considers possible prejudice to the defendants, while 23(b)(1)(B) looks to possible prejudice to the putative class members." *In re Ikon Office Solutions*, 191 F.R.D. 457, 466 (E.D. Pa. 2000).

Here, Rule 23(b)(1)(A) is satisfied.   As stated above, there were over 38 million shares of Rentech Nitrogen common stock issued and outstanding as of July 31, 2015.   Thus, the Class likely consists of hundreds, if not thousands, of members. In the absence of class certification there is potential for a large number of individual cases based on the same underlying facts, creating a high risk of inconsistent or varying adjudications that would establish incompatible standards of Defendants' conduct.   *See Alvidres v. Countrywide Fin. Corp.*, No.CV07-5810-RJK(CTX), 2008 WL 1766927, at *3 (C.D. Cal. Apr. 16, 2008); *In re Ikon Office Solutions*,191 F.R.D. at 466 (finding a "risk of inconsistent dispositions that would prejudice the defendants: contradictory rulings as to whether Ikon had itself acted as a fiduciary, whether the individual defendants had, in this context, acted as fiduciaries, or whether the alleged misrepresentations were material would create difficulties in implementing such decisions").   Moreover, the claims Plaintiff alleges on behalf of the proposed Class are derived from core issues that are not

individual in nature: whether Defendants breached their fiduciary duties by entering into and approving the Merger, and whether the Class members were harmed by Defendants' alleged breaches.

In addition, Defendants are alleged to have "acted . . . on grounds that apply generally to the class," making final equitable relief with respect to the whole Class appropriate. FED. R. CIV. P. 23(b)(2). The claims are essentially slightly modified legal theories applied to the same "wrongs." They involve one set of actions by Defendants creating a uniform type of impact upon the Class. In sum, the proposed Class satisfies the requirements of both Rule 23(b)(1) and Rule 23(b)(2).

## VI.   THE PROPOSED NOTICE PROGRAM IS APPROPRIATE

The parties have negotiated the form of a Notice of Pendency of Class Action, Proposed Settlement, Settlement Hearing and Right to Appear ("Notice") to be disseminated to the Class to notify them of the terms of the Settlement and of their rights in connection therewith. The Notice is attached to the Stipulation as Exhibit C. The Notice will be sent by U.S. mail to all Class members who can be identified with reasonable effort to inform them of the terms of the Settlement, their rights in connection with the Settlement, and the date of the Settlement Hearing, at which the Court will consider final approval of the Settlement and attorneys' fees and expenses.

The parties have agreed to use first class U.S. mail for notifying Class members of the Settlement. Upon entry of the Preliminary Approval Order, Rentech Nitrogen will cause the Notice to be mailed to "to each person who is shown on the records of Rentech Nitrogen, its successors-in-interest or their respective transfer agents, to be a record owner of any common units of Rentech Nitrogen (the "Common Units") at any time between August 9, 2015 through April 1, 2016, at his, her, or its last known address appearing in the transfer records of

unitholders maintained by or on behalf of Rentech Nitrogen." *See* Preliminary Approval Order at ¶5.

The Parties believe that Notice by first-class mail is the best notice practicable under the circumstances, is typical of the notice given in other class actions and satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

Any Class member who wishes to object to the settlement must file and serve his, her or its objection in accordance with the procedures in the Notice. Objecting parties can submit an objection in opposition to any aspect of the Settlement and can appear (or may appear through counsel) at the Settlement Hearing to present their arguments. This Court should find that the Notice and the procedures for its dissemination is the best notice practicable under the circumstances, and shall constitute full and adequate notice to all persons entitled thereto.

## VII. PROPOSED SCHEDULE OF EVENTS

Plaintiff proposes the following schedule for mailing notice to the Class, for Class members to object to the Settlement, and a date for the Settlement Hearing.

| | |
|---|---|
| Notice mailed to Class | Not less than sixty (60) days before the Settlement Hearing |
| Objections | No later than fourteen (14) business days prior to the Settlement Hearing |
| Affidavit re Notice | Not less than ten (10) days before the Settlement Hearing |
| Date by which Plaintiff to file papers in support of Settlement, including the application for an award of attorneys' fees and expenses | At least sixteen (16) days before the Settlement Hearing |
| Defendant opposition, if any, to Plaintiff's application for attorneys' | At least eight (8) days before the Settlement Hearing |

1  fees and expenses

2

3  Response to unitholder objection, if        Five (5) court days before the
   any                                         Settlement Hearing

4

5  Settlement Hearing                          No earlier than 60 calendar days
                                               from entry of Preliminary
6                                              Approval Order

7       This schedule is similar to those used and approved by numerous courts in

8  class action settlements and provides due process to Class members with respect to

9  their rights concerning the settlement.

10  **VIII.   CONCLUSION**

11

12      For all of the foregoing reasons, Plaintiff respectfully requests the Court to

13  preliminarily approve the proposed Settlement, and enter the Order.

14  DATED:  May 17, 2016               Respectfully submitted,

15

16                                     BRODSKY & SMITH, LLC

17
                                       *s/ Evan J. Smith*
18                                     By: Evan J. Smith
                                       9595 Wilshire Boulevard, Suite 900
19                                     Beverly Hills, CA 90212
                                       Tel:  (877) 534-2590
20                                     Fax: (310) 247-0160

21                                     *Counsel for Plaintiff Jesse Sloan*

22

23

24

25

26

27

28